

Opinions of the United
States Court of Appeals
for the Third Circuit

9-14-2006

# USA v. Johnson

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3856

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Johnson" (2006). *2006 Decisions.* Paper 456.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/456

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 05-3856 and 05-3960

———

UNITED STATES OF AMERICA

v.

JEFFREY JOHNSON,
                Appellant in No. 05-3856

and

JAMES PHILLIPS,
                Appellant in No. 05-3960


———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. Nos. 00-cr-00419-3 and 00-cr-00419-8)
District Judge: Hon. Eduardo C. Robreno


———

Submitted Under Third Circuit LAR 34.1(a)
September 11, 2006

Before:  SCIRICA, Chief Judge, SLOVITER and BARRY, Circuit Judges

(Filed:  September 14, 2006 )

———


OPINION


SLOVITER, Circuit Judge.

Appellants Jeffrey Johnson and James Phillips were convicted of involvement in a drug-related conspiracy and Phillips was also convicted of substantive drug offenses. They appeal the order of the District Court denying their renewed motion for a new trial based upon (1) Brady violations and (2) newly discovered evidence.

**I.**

Appellants' jury trial was held in December 2000. The trial centered on a drug distribution conspiracy run by Leon Hunt, Gregory Hunt and Jeffrey Hunt (the "Conspiracy"). The Conspiracy sold cocaine base ("crack") in the area of the Spring Garden Apartments (a public housing facility owned and operated by the Philadelphia Housing Authority (PHA)). Trial focused on the time period between March 1999 and January 2000. The Conspiracy sold crack in clear plastic gel caps, gel caps labeled "357," and sections of vinyl or plastic tubing plugged with cork or wooden dowels. The most disputed issue at trial was whether Appellants were in fact members of the Conspiracy.

**A. Distinguishing the Conspiracy**

The Government sought to provide the jury with the basis to distinguish a member of the Conspiracy from a non-conspirator in a mere "buyer-seller" relationship with the Conspiracy.[1] In its opening statement, the Government stated that "this group would

---

[1] "[A] simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish that the buyer was a member of the seller's conspiracy." United States v. Gibbs, 190 F.3d 188, 197 (3d

2

distinguish itself by using [two] typical business techniques," A844,[*] namely: (1) selling

crack in "a general target area" around the Spring Garden Apartments, and (2) marketing

it in a "unique packaging." A845. The Government described the "unique packaging" as

follows:

> [From at least March 1999 to the fall of the same year,] the defendants were selling the crack cocaine package[d] in little clear gel caps, gel capsules, sort of like what you see in a Contac pill and the crack would be inside there. And that would be the unique packaging that this group would use to sell the crack cocaine. And oftentimes those gel capsules were labeled with 357, which meant three rocks for $5 on 7th Street, so that each capsule would be sold for $5.
>
> . . . . [T]he packaging changed in about the fall of 1999, and what this group started using were tubes, like tubes that would be cut and the drugs would be put inside the tube and wooden dowels would be placed at each end to close up the tube . . . .

A845; see also App. at 31.

Rashael Harris, a/k/a Rochelle Ross ("Harris"), testified pursuant to a plea

agreement with the government that she sold crack cocaine in clear gel caps and gel caps

labeled "357" for the Conspiracy. She also testified that "the cocaine was packaged in the

---

Cir. 1999).

[*] Consistent with Johnson's brief, references to the appendix pages preceded by an "A" refer to the appendix filed with Johnson's prior appeal before this Court (No. 02-1500); the references labeled "App." refer to the appendix filed with the instant appeal. See Johnson's Br. at 1.

3

clear caps and the 357 labels" because "[i]t was something different, something to separate it from anybody else's from around there." A1273. Harris testified that people not involved in the Conspiracy were selling in the area where she sold but "they were selling cocaine packets in other ways . . . ." A1288. Similarly, Corporal John Rodriguez of the Philadelphia Police Department testified at trial that what made the gel capsules sold by the Conspiracy distinctive was the fact that there was a "357 on these little capsules . . . . and the fact that [the drugs] were contained in those plastic capsules initially." A1139.

Undercover Officer Christina Goodwin-Laws of the Philadelphia Police Department testified that distribution of crack in clear gel caps occurred only in the region where the Conspiracy was based. She testified that she and Officer Israel Morales purchased four gel caps of crack from Johnson near the Spring Garden Apartments on May 13, 1999; two of these gel caps were marked with "357" while two were clear and unmarked.

Philadelphia police officer Leslie Simmons testified that in her experience crack-packed gel capsules generally ("not just the [capsules marked with] 357") did not "exist anywhere else in the City of Philadelphia." A1010. She testified that both the capsules themselves and the "357" marking were "indigenous to the [region of the Conspiracy]." A1010. Police undercover officer Richard L. Cujdik of the Philadelphia Police Department testified that "[d]ue to the packaging" of the drugs in the Conspiracy area, the "whole area was considered part of Jeffrey Hunt's organization." A1090.

4

The Government argued to the jury during its rebuttal closing argument that no group other than the Conspiracy sold crack in clear gel caps:

> The packaging was unique to the [Conspiracy] area, the caps both marked and unmarked and the gelcaps. Three experienced narcotics officers told you that. . . . There's no evidence that any other group was selling even the clear gelcaps anywhere else. It was here. . . . [T]here was [sic] other sales in that area but no one else but this group was selling the gelcaps . . . . That's what it tells you and you don't have to be an expert to know that.

A1586-87.

## B. Distinguishing Johnson as a Member of the Conspiracy

In order to link Johnson to the Conspiracy, the Government presented evidence tending to show that Johnson: (1) bought drugs from members of the Conspiracy, and (2) sold drugs in gel caps (both marked and unmarked) and dowel-stopped tubing. Rashael Harris's testimony provided the Government's only evidence that Johnson purchased drugs from the Conspiracy. Harris testified that she saw Johnson "[g]etting his packs" from the Conspiracy's distribution location approximately "three or four or five times a week." A1277. Harris testified that this frequency of purchase was "[n]ot much," but did not testify why she thought three to five visits per week was infrequent. A1277.

With regard to Johnson's sale of drugs, the Government presented four items of evidence. First, Harris testified that she couldn't "recall the date, [but] between July and September [1999]" she bought crack from Johnson packaged in "gelcaps" in the Conspiracy's area of operation. A1281-83. Second, on May 13, 1999, Officer Goodwin-

5

Laws testified that she and Officer Morales purchased four gel caps of crack from Johnson, two of which were clear and two of which were marked "357." Furthermore, Officer Cujdik testified that shortly thereafter five additional gel caps filled with crack and marked "357" were recovered from a windowsill near the location where Johnson had been dealing. Third, Officer Harold Poles testified that, on September 20, 1999, Johnson was arrested in the Conspiracy's area in possession of twenty clear gel caps of crack cocaine. Fourth, Officer Harry Wenger testified that, on November 6, 1999, Johnson was arrested in the same area, again in possession of twenty clear gel caps, but also in possession of crack packed in sections of tubing stopped with cork dowels.

### C. Distinguishing Phillips as a Member of the Conspiracy

In order to link Phillips to the Conspiracy, the Government presented evidence tending to show that he: (1) bought drugs from members of the Conspiracy, and (2) sold drugs in tubes stopped with wooden dowels. Rashael Harris's testimony provided the Government's only evidence that Phillips purchased drugs from the Conspiracy. At first, Harris testified that "during the time that [she was] . . . selling cocaine for Jeffrey Hunt," she "[saw] Phillips at 622 Franklin Place" (a Conspiracy distribution point) "[a]bout three or four times out of the week," but that she "didn't see him picking up any packs [of crack]." A1279. However, she later testified that when she saw Phillips at 622 Franklin Place she witnessed "him come out of the house with a pack [of crack]." A1280.

As to Phillips's sale of drugs, the Government presented two items of evidence. First, Rashael Harris testified that, "during the latter part of 1999," she purchased crack

6

from Phillips "[o]nce" in the courtyard of the Spring Garden Apartments, and that it was contained in vials with "[wooden] ends." A1283. Second, Officer Goodwin-Laws testified that, on December 14, 1999, she witnessed Phillips sell items to a confidential informant which, in a later search of that informant, were found to be four sections of tubing stopped with cork dowels. She then provided a description of Phillips to backup officers, who apprehended Phillips ten minutes later. Corporal Rodriguez testified that he stopped Phillips based on Goodwin-Laws's description and found in Phillips's mouth five plastic tubes stopped with wooden corks and containing crack.

## D. The Discovery of Suppressed and New Evidence

Both Johnson and Phillips were convicted of conspiracy to distribute over fifty grams of cocaine base in violation of 21 U.S.C. § 846.[2] The jury returned a supplemental verdict finding that the amount of cocaine base attributable to the Conspiracy amounted to fifty or more grams. The District Court denied Appellants' motions for judgment of acquittal or new trial. United States v. Hunt, No. 00-419, 2001 U.S. Dist. LEXIS 2642, at *18-19 (E.D. Pa. March 14, 2001), aff'd, 47 F.App'x 174 (3d Cir. 2002), and Appellants appealed their convictions and sentences.

While the appeals were pending, Johnson filed a second motion for new trial based

---

[2] Phillips was additionally convicted of distributing cocaine base in violation of 21 U.S.C. § 841(a)(1) and of distributing cocaine base within one thousand feet of a public housing facility in violation of 21 U.S.C. § 860. All substantive counts against Johnson were dismissed by order dated December 13, 2000.

7

in part on a <u>Brady</u> claim and newly discovered evidence. This <u>Brady</u> claim was based upon the following three items of allegedly suppressed evidence: (1) a homicide file related to the death of Odell Priest which contained a police report referring to the discovery of a number of crack-containing gelcaps labeled "187" in the Spring Garden Apartments, (2) Gregory Hunt's testimony at Johnson's sentencing hearing, which suggested that people not associated with the Conspiracy were selling crack at the Spring Garden Apartments in clear, unmarked gelcaps, and (3) a post-trial letter from the Government tending to show that "187"-marked gelcaps were prevalent around the Spring Garden Apartments and that Rashael Harris and Gregory Hunt had both told the Government that dealers not in the Conspiracy were using gel caps in the vicinity. The District Court denied the motion and proceeded to sentence Appellants.

This court affirmed the District Court's judgments of conviction and sentence on November 12, 2003, stating that we had considered "all of the other issues raised by appellants, and [found] them to be without merit." <u>United States v. Phillips</u>, 349 F.3d 138, 143 (3d Cir. 2003). We rejected Johnson's argument "that the District Court erred when it failed to grant a new trial based on . . . newly discovered evidence[] and . . . a <u>Brady</u> violation." <u>Id.</u> at 143 n.5.

On December 19, 2003, Appellants filed the renewed motion for new trial that is the subject of the present appeal. As the District Court stated, they raised the following eight items of alleged <u>Brady</u> evidence:

1. The discovery of gel caps bearing "187" labels, recovered by a partner of

one of the witnesses who testified, during the homicide investigation, at the housing project in question, during the course of the conspiracy;

2. The discovery of other drugs packaged in gel caps, bearing the "187" label, based upon other police reports of the Philadelphia Police Department;

3. The substance of the information contained within the handwritten notes of the prosecutor assigned to the case, in the course of pre-trial preparation of [Harris] that other drug distributors, at the housing project in question, during the course of the conspiracy, were utilizing gel caps to package their crack cocaine;

4. The substance of the information contained within the handwritten notes of the prosecutor assigned to the case, in the course of a proffer of Gregory Hunt, a leader of the alleged conspiracy and government cooperator, that other crack cocaine dealers were distributing their drugs packaged in gel caps;

5. Information from the Philadelphia Housing Authority Police Department that during the course of the conspiracy, at the location of the conspiracy, individuals not affiliated with the Hunt organization were peddling crack cocaine packaged in gel capsules, with such individuals having been identified, arrested and prosecuted by such local authorities, including, but not limited to, the apprehension of one Dawn Benson, and the apprehension, arrest and prosecution of one Leroy Washington for an observed sale and possession on March 2, 1999 [in the Pennsylvania Court of Common Pleas, Philadelphia County, Feb. Term, 1999, No. 802];

6. Material relative to the character of the supervisory police officer involved in the case, Corporal John Rodriguez, who provided material testimony at trial, namely allegations of his involvement in a theft from drug dealer as revealed by Kenneth Spencer which was the subject of an investigation by the Federal Bureau of Investigation;

7. Material relative to the character of the supervisory police officer involved in the case, Corporal John Rodriguez, who provided material testimony at trial, namely allegations of his involvement in a second theft from an alleged participant in a narcotics related transaction, as set forth in the *Roberts Report*, which was the subject of an investigation by the Federal Bureau of Investigation and which still has not been disclosed by the

Government; and

> 8. Material relative to the allegation of a theft from a drug dealer, Reginald
> Harris, during the course of this very investigation, involving Police
> Officers Simmons and Cujdik, who provided material testimony at trial.

App. at 35-36; id. at 36-37 n.5 (noting that "Johnson's Supplemental Memorandum,"

upon which the District Court based this list, "was submitted to the Court, but never filed

of record."); cf. Johnson's Br. at 36.  Appellants also argued that a new trial was

warranted on the basis of newly discovered evidence not wrongfully suppressed, namely:

> 9. Information from a leader of the conspiracy, Gregory Hunt that the use of
> clear unmarked gel caps, by the conspirators, were exceedingly rare;
>
> 10. Information from Gregory Hunt that such use of gel caps by the
> conspirators ended prior to the summer of 1999;
>
> 11. Information from Gregory Hunt that there were other, unrelated, drug
> dealers operating in the area;
>
> 12. Information from Gregory Hunt that other drug dealers were using clear
> gel caps and that the purpose of the "357" label was so that the Hunt gel
> caps would not be confused with those of competitive dealers;
>
> 13. Identification of the "Steve," referred to by Gregory Hunt as a dealer of
> clear gel caps not affiliated with the conspirators, at the Spring Garden
> Projects, as one Steven Deveraux a/k/a Steve Hopkins (his 'partner' Kaleef
> remains unidentified); and
>
> 14. Identification of other non-Hunt organization dealers selling crack
> packaged in gel caps in the geographic area in question as the "Meatloaf"
> organization (including Richard Thigpen and Lionel Simmons, both of
> whom had been arrested at the time) and "Fred."

App. at 36.

In a comprehensive and well-reasoned opinion, the District Court denied

10

Appellants' request for a new trial. It concluded that only items 1, 2, 3, 4, 6, and 7 were wrongfully suppressed prior to trial. Despite applying the lenient standard applicable to wrongfully suppressed evidence, the District Court rejected Appellants' <u>Brady</u> claim on the ground that the items were not "material" under <u>Brady</u>, i.e., they did not undermine confidence in the verdicts. A39. Next, the District Court rejected Appellants' request for a new trial based upon the fourteen items of newly discovered evidence, because it could not "conclude that had this evidence been available prior to trial Johnson would probably have been acquitted . . . ." A41. Appellants timely filed the present appeal.

## II. Discussion

We "conduct a de novo review of the district court's conclusions of law as well as a 'clearly erroneous' review of any findings of fact where appropriate." <u>United States v. Price</u>, 13 F.3d 711, 722 (3d Cir. 1994) (quoting <u>United States v. Perdomo</u>, 929 F.2d 967, 969 (3d Cir. 1991)) (quotation marks omitted).

### A. The <u>Brady</u> Claim

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that the Due Process Clause forbids a prosecutor from suppressing "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87. To establish a due process violation under <u>Brady</u>, a defendant must make three showings: "(1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment." <u>United States v. Pelullo</u>, 399 F.3d 197,

11

209 (3d Cir. 2005) (quoting <u>United States v. Dixon</u>, 132 F.3d 192, 199 (5th Cir. 1997))

(quotation marks omitted).

**1. Favorable Evidence Wrongfully Suppressed**

The Government conceded that items 3, 4, 6, and 7 were wrongfully suppressed.

Citing <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), the District Court also found that the

Government wrongfully failed to turn over items 1 and 2 because they constitute evidence

favorable to Appellants known to the Philadelphia Police before trial, and the

Philadelphia Police carried out a significant part of the Conspiracy investigation. <u>Id.</u> 437

(explaining that the Government has a duty to learn of and disclose any favorable

evidence known to others acting on its behalf).

However, the District Court found that items 5 and 8 were not wrongfully

suppressed. The District Court treated item 8 as non-suppressed newly discovered

evidence because Appellants conceded that it was first discovered by prosecutors more

than a year after trial. The Court found that item 5 was not wrongfully suppressed

because there is no indication that the U.S. Attorney's Office possessed or should have

possessed the item 5 evidence; the evidence was privy only to the Philadelphia Housing

Authority ("PHA") and "there is no indication that prosecutors in this case and the [PHA]

'engaged in a joint investigation or otherwise shared labor and resources,' which would

impute possession of this information to the prosecutors." App. at 38 (citing <u>Pelullo</u>, 399

F.3d at 216).

Appellants make no argument specifically challenging the District Court's

12

conclusion as to item 8. As to why item 5 – information collected by the PHA – should be included, the District Court correctly noted that Appellants "have offered no evidence to suggest that [PHA officers] were working on behalf of the United States Attorney's Office," and therefore that office "had no duty to learn of or disclose information from the [PHA]." App. at 38.

The District Court did not err in making its well-reasoned findings that items 5 and 8 were not wrongfully suppressed. See generally Price, 13 F.3d at 722 ("where the district court applies the correct legal standard, its 'weighing of the evidence merits deference from the Court of Appeals . . . .'") (quoting United States v. Pflaumer, 774 F.2d 1224, 1230 (3d Cir. 1985)) (citations omitted).

### 1. Materiality

To make the third and more complicated showing under Brady (i.e., as to whether the wrongfully suppressed evidence was "material"), a defendant must show that in the absence of the suppressed evidence s/he did not "receive[] a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434. A new trial is mandated where there is a "reasonable probability" that the result of the proceeding would have been different if wrongfully suppressed evidence had been disclosed to the defense. Id.; Perdomo, 929 F.2d at 971. "A reasonable probability [amounts to] a probability sufficient to undermine confidence in the outcome." Perdomo, 929 F.2d at 971 (quoting United States v. Bagley, 473 U.S. 667 (1985)) (quotation marks omitted).

It is irrelevant whether Appellants would have received a different verdict if this

13

evidence were not suppressed; rather, the relevant question is whether Appellants were deprived of a fair trial because of the absence of the evidence. See Banks v. Dretke, 540 U.S. 668, 698 (2004) (quoting Kyles, 514 U.S. at 435) (explaining that the proper question is whether the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"); Strickler v. Greene, 527 U.S. 263 (1999).

Our review compares the totality of the evidence in this case to the conspiracy charge under which Appellants were convicted. Perdomo, 929 F.2d at 971; see United States v. Pressler, 256 F.3d 144, 149 (3d Cir. 2001) (elements of conspiracy charge). The Government must show beyond a reasonable doubt that a defendant has "knowledge of the illegal objective contemplated by the conspiracy." United States v. Perez, 280 F.3d 318, 342 (3d Cir. 2002) (citations and quotation marks omitted). Where "a defendant drug buyer has repeated, familiar dealings with members of a conspiracy, that buyer probably comprehends fully the nature of the group with whom he [or she] is dealing . . . ." Gibbs, 190 F.3d at 199. Even "an occasional buyer for redistribution[] can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation." Perez, 280 F.3d at 343 (quoting Price, 13 F.3d at 728) (quotation marks omitted).

In our earlier opinion, we considered the cumulative effect of items 1, 2, 3, and 4 and concluded that this evidence was not material to Johnson's conspiracy convictions. Phillips, 349 F.3d at 143 n.5. The same assessment was not made as to Phillips because

he was not a party to Johnson's first motion for a new trial.[3]  In any event, items 1, 2, 3, and 4 tend to exculpate Phillips to a lesser extent than Johnson because they apply only to testimony concerning gel caps, and Phillips was caught selling crack in vinyl tubing.

As this court previously explained, items 1, 2, 3, and 4 fail to meet the Brady materiality standard.  Although items 1 and 2 support an inference that another conspiracy operated in the area of the Conspiracy, the Government did not argue at trial that other conspiracies were not present in the area.  Johnson argues that items 3 and 4 undermine the Government's argument to the jury that "crack cocaine package[d] in little clear gel caps, gel capsules . . . . would be the unique packaging that [the Conspiracy] would use to sell the crack cocaine."  A845; Johnson's Br. at 45-51.  However, even if clear gel caps were not "unique" to the Conspiracy, the exculpatory evidence does not disturb trial testimony that clear gel caps were one method by which the Conspiracy packaged crack.  Therefore, evidence that Johnson sold both "357" gel caps and clear gel caps is consistent with his being a conspirator.  As to Phillips, this evidence is not even exculpatory because he was caught selling crack in dowel-stopped vinyl tubing, not clear gel caps.

Nor could Harris have been directly impeached with item 3.  We agree with the District Court that Harris's testimony that the Conspiracy sold crack in unmarked and "357"-marked gel caps to distinguish its drugs is not inconsistent with item 3 because

_____

[3]  There is no contention that Phillips has waived his right to raise the issues presently on appeal by failing to join Johnson's first motion.

15

"[Harris] was never asked, and therefore she never testified, as to whether Non-Hunt members also used gel caps to package their drugs." App. at 40. She only testified that non-conspirator dealers sold crack "in other ways." App. at 40-41.

Finally, Appellants suggest that item 3 could have served the added purpose of impeaching Harris's character for truthfulness. Harris's cross-examination was already extraordinarily damning, and it is highly unlikely that further impeachment of her character would have had any effect on the jury's opinion of her. For example, she openly stated on cross examination that she had used $50-$100 of crack per day since the age of 16, had prostituted herself for crack for 5 years, and was high during most if not all of the times she testified seeing Appellants picking up crack from the Hunts. Furthermore, she admitted that she knew the Government would drastically reduce her sentence in exchange for favorable testimony, and was desperate to do anything she had to do to assure that she would get as little jail time as possible and not be separated from her children.

Furthermore, we cannot conclude that the added value of items 6 and 7 to items 1, 2, 3, and 4 has the "cumulative effect" of undermining our confidence in Appellants' verdicts. Kyles, 514 U.S. 437 n.10; United States v. Pelullo, 105 F.3d 117, 123 (3d Cir. 1996). Items 6 and 7 could serve to impeach the credibility of Corporal Rodriguez. (Rodriguez's relevant testimony was that the use of gel caps, both marked and unmarked, was unique to the Conspiracy, and that he arrested Phillips based on Officer Goodwin-Laws's description.). First, items 6 and 7 are of limited exculpatory value for the same

16

reasons as items 3 and 4: they tend to establish that the Conspiracy was not the only conspiracy selling clear gel caps of crack, but do not suggest that the Conspiracy did not sell crack in clear gel caps. Second, even if Rodriguez's testimony had been completely discredited based upon items 6 and 7, the jury would still have had before it the testimony of Officer Goodwin-Laws, who witnessed Phillips selling crack to a confidential informant, as well as that of Rashael Harris, who saw Phillips at the Conspiracy distribution point several times a week.

For the foregoing reasons, we conclude that the cumulative effect of items 1, 2, 3, and 4 does not undermine our confidence in the jury's verdict.

## B. Newly Discovered Evidence

Appellants argue that a new trial must be granted under Federal Rule of Criminal Procedure 33 based on items 1-14, which include six items of newly discovered evidence not claimed to be Brady evidence. To determine whether a new trial must be granted on the basis of newly discovered evidence we "apply the following five-part test":

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

United States v. Jasin, 280 F.3d 355, 361 (3d Cir. 2002) (citations and punctuation omitted).

Most of the newly discovered evidence suggests that the Conspiracy most often

17

did not use clear gel caps to package drugs after the spring of 1999. Furthermore, it is uncontested that almost all of the crack recovered from Johnson was packaged in clear gel caps. However, crack was recovered from Johnson packaged in "357"-marked gel caps and dowel-stopped vinyl tubing, and Phillips was caught selling crack only in dowel-stopped tubing. Substantial evidence presented at trial supported the inference that these packaging methods were unique to the Conspiracy.

Assuming arguendo that the clear gel caps recovered from Johnson originated from a non-conspirator dealer, this evidence does not suggest Johnson was not selling for the Conspiracy; rather, it supports the inference that he was selling for the Conspiracy and also acquiring crack from other sources. As to Phillips, the evidence demonstrates that he was selling crack only in dowel-stopped tubing; as such, nearly all of the newly discovered evidence is completely unavailing to his newly discovered evidence claim.

With regard to item 8, Appellants implicate Officers Simmons and Cujdik in a theft from a drug dealer. The District Court noted that this evidence would have been inadmissible at trial under Federal Rule of Evidence 608(b) because it is not probative of truthfulness. Even if it were admissible under Rule 608(b), the District Court continued, it would not be admissible under Rule 403 because its probative value would be substantially outweighed by the danger of unfair prejudice due to the fact that allegations of the Officers' theft have never been substantiated. We add that even if item 8 were admitted despite Rules 403 and 608, no factfinder could reasonably disregard the Officers' testimony based on their purported involvement in the alleged theft.

18

Because the evidence forming the basis on which the jury convicted Appellants was only slightly disturbed by the newly discovered evidence they proffered, we cannot conclude that the newly discovered evidence they presented would probably have produced an acquittal.

## III.

We will affirm the judgments of the court below denying Appellants a new trial.