**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

**IN AND FOR KENT COUNTY**

| | |
|---|---|
| **STATE OF DELAWARE** | ) |
| | ) |
| **v.** | ) |
| | ) |
| | ) |
| **MARLOW E. HOLMES,** | ) |
| **1501015446** | ) |
| | ) |
| **Defendant.** | ) |

Submitted: August 3, 2015
Decided: September 3, 2015

## OPINION

## UPON DEFENDANT'S MOTION TO SUPPRESS
## GRANTED

Zachary A. George, Esquire, Department of Justice, for the State.

J'Aime L. Walker, Public Defender's Office, for the Defendant

CLARK, J._____

## I.  INTRODUCTION

Before the Court is Marlow Holmes' ("Defendant's") Motion to Suppress all evidence seized as a result of what the Defendant alleges was an unlawful search and seizure of his person and property following a traffic stop that coincided with an independent undercover drug investigation.  The Defendant argues that the evidence

was obtained in violation of the Fourth Amendment of the United States Constitution and Article I, §6 of the Delaware Constitution. A suppression hearing was held on August 3, 2015. At the hearing, the State called one witness to testify– the officer in charge of the undercover drug investigation. The State did not present as witnesses the officers involved in the traffic stop or subsequent search and arrest at issue. The primary issues in this case involve whether the State's burden in a motion to suppress can be met solely by hearsay and whether the circumstances of this case require application of the collective knowledge doctrine. The presentation of evidence at this suppression hearing provided the inverse of the typical situation involving an undercover officer. Here, the undercover officer provided all of the testimony and the arresting and searching officers did not appear or testify at the hearing. In light of the law, the facts of this case, and the parties' submissions, the Defendant's motion is **GRANTED**.

## II. FINDINGS OF FACT

All testimony and evidence in the suppression motion came from the testimony of Detective Scott Hurd ("Detective Hurd"). In early January 2015, Detective Hurd was working undercover as a part of the Dover Police Department's Drug Vice and Organized Crime Unit. At that time, Detective Hurd was contacted by a confidential

2

informant[1] ("CI") who told him that a black male known as Carolina was selling cocaine in the downtown Dover area. According to the CI, the man in question had a prosthetic leg which he used to store and transport cocaine. The CI also informed Detective Hurd that Carolina drove a blue Ford Crown Victoria with Delaware registration HP31970. With that information, Detective Hurd conducted a Delaware Criminal Justice inquiry check that confirmed Defendant Holmes as the registered owner of the Crown Victoria. Pursuant to that inquiry, Detective Hurd obtained a picture of Defendant Holmes. Detective Hurd showed the picture to the CI who positively identified Defendant Holmes as Carolina. A month long investigation of Carolina followed which culminated on the date in question.

On January 26, 2015, the CI contacted Detective Hurd and informed him that the Defendant was in possession of cocaine on Division Street in Dover. Detective Hurd used the CI's cell phone to contact the Defendant. According to Detective Hurd, the Defendant confirmed that he was in possession of cocaine and asked how much Detective Hurd needed. Detective Hurd asked for a "ball game" which is slang for 3.5 grams of cocaine. The Defendant said he did not have the requested quantity

---

[1] According to Detective Hurd's testimony, the CI, known as No. 496, was past-proven and reliable.

3

at that time, but would go to Smyrna to meet with his "people"[2] and return in approximately an hour with the requested drugs.

Meanwhile, Detective Hurd and his partner established surveillance in the 300 block of Division Street and identified the Defendant. They observed the Defendant get into the front passenger seat of a white Chevrolet Tahoe with Delaware registration. The Tahoe headed West on Division Street and Detective Hurd and his partner followed. The Tahoe then stopped at the Dover Express Gas Station and the Hamlet Shopping Center before entering northbound Route One toward Smyrna.

From there, Detective Hurd followed the Tahoe onto Northbound Route One and then onto Southbound Route 13 via the North Smyrna exit. From Route 13, the Tahoe pulled into the Shore Stop Gas station. All the occupants remained in the vehicle and after a few minutes, the Tahoe left the Shore Stop gas station and continued Southbound on Route 13 before entering the Valero gas station in Smyrna. Detective Hurd observed the Defendant exit the vehicle and enter the business through a side door. After a few minutes, the Defendant returned to the vehicle which then proceeded North again on Route 13 to the Shore Stop gas station for a second time.

---

[2] According to Detective Hurd's testimony, "people" is a common term in the drug world for a dealer's source of supply.

Detective Hurd watched as the vehicle parked at the gas pumps. The driver exited the Tahoe and entered the business. Meanwhile, the Defendant exited the vehicle and walked to a white Chevrolet Silverado parked at the adjacent fuel pump and entered the front passenger seat. The Defendant remained in the Silverado for a few minutes before exiting and returning to the Tahoe. The Tahoe exited the gas station and Detective Hurd followed it. As the Tahoe entered Southbound Route One, Detective Hurd continued to follow it toward Dover.

According to Detective Hurd, based on his training and six years of undercover experience, he believed he had just witnessed the Defendant meet his cocaine supplier. His belief was grounded in the information described above.

Detective Hurd testified adamantly that he did not relay the above-mentioned information to other officers, however. There was no testimony at the hearing involving contact between Detective Hurd and any other officer. In the police report, attached as an exhibit to Defendant's Motion to Suppress, there was a single reference addressing contact among officers. That lone reference stated that Detective Hurd radioed other officers when he entered Southbound Route 1 to return to Dover to make them, including Officer Martinek, "aware of our location." No other testimony, evidence, or reference in the police report evidences the sharing of any of the above-mentioned information. In fact, the testimony at the hearing conclusively established

5

this information was **not** relayed to other officers outside the undercover vehicle.

Detective Hurd next testified that Officer Martinek, from the Dover Police Department, independently observed a seatbelt violation in the Tahoe and stopped the Tahoe. Due to his undercover capacity, Detective Hurd did not participate in the stop but watched from a distance of approximately fifty yards. Detective Hurd did not witness any facts relevant to a seatbelt violation in the Tahoe at issue.

At some point after the stop of the vehicle by Officer Martinek, Detective Hurd, still from approximately fifty yards away, observed as Officer Hannon and his K-9 partner arrived on scene and conducted a sniff of the vehicle. At that time, all of the occupants were removed from the vehicle. Detective Hurd testified that he was later informed that the dog alerted the presence of drugs on the front passenger side door of the Tahoe. Detective Hurd also testified that the officers later informed him that at the scene they performed background checks on the occupants. Detective Hurd did not recall the results of the checks. The officers on the scene, not Detective Hurd, made the decision to take the occupants and the vehicle into custody. Detective Hurd was unable to testify as to who made the decision for the arrest or the precise reason for it. He did testify, however, that Officer Stagg later told him that officer safety was an issue and that the Defendant appeared to be extremely nervous while still in the vehicle and repeatedly asked to use the bathroom.

6

The occupants and the vehicle were transported to the Dover Police Department so a thorough search could be conducted. Once there, Detective Hurd searched the vehicle but no contraband was located. According to Detective Hurd, he was told that at some point, his supervisor, Detective Dickinson authorized strip searches of all the vehicle's occupants. Detective Hurd indicated he was not present when the decision was made and did not recall the reasons that were given for performing the strip searches. He was told by fellow officers that a search of the Defendant uncovered a clear knotted plastic bag hidden in his left prosthetic leg, and that a field test returned positive for cocaine at which point the Defendant was read his *Miranda* rights. The Defendant was then charged with Aggravated Possession, Drug Dealing, and Possession of Drug Paraphernalia.

### III. STANDARD OF REVIEW

In evaluating a motion to suppress evidence seized during a warrantless search or seizure, the State bears the burden of establishing that the challenged search or seizure was performed in a manner so as to protect the individual rights guaranteed by the United States Constitution, the Delaware Constitution and state statutes.[3] The State must persuade the Court that an initial stop, arrest and search were lawful by a

---

[3] *State v. Chandler*, 2015 WL 1731508, at *3 (Del.Super. April 2, 2015)(citing *Hunter v. State*, 783 A.2d 558, 560(Del. 2001)).

preponderance of the evidence.[4]

## IV.  DISCUSSION

### A.      Legal standard for a traffic stop

The Fourth Amendment of the United States Constitution and Article I, Section 6 of the Delaware Constitution, protect individuals from unreasonable searches and seizures.[5]  When it comes to a traffic stop, "the State must demonstrate that the stop and any subsequent police investigation were reasonable under the circumstances. First, the stop must be justified at its inception by reasonable suspicion of criminal activity as defined in *Terry v. Ohio*."[6]  Delaware courts consistently define reasonable suspicion as an "officer's ability to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion."[7] Courts must evaluate the intrusion "through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts **with such an**

---

[4] *Id*. (Citing *State v. Abel*, 2011 WL 5221276, at *2 (Del. Super. Oct.31, 2011) *aff'd,* 68 A.3d 1228 (Del. 2012), as *Amended* (Jan.22, 2013)).

[5] U.S. Const. amend. IV; Del. Const. art. I, § 6.

[6] *Caldwell v. State*, 780 A.2d 1037, 1045-46 (Del. 2001) (citing *Terry v. Ohio*, 392 U.S. 1, 16–19 (1968) ( "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.")).

[7] *Chandler*, 2015 WL 1731508, at *4 (quoting *Holden v. State*, 23 A.3d 843, 847 (Del. 2011)).

8

**officer's subjective interpretation of those facts**."[8]

### B. Legal standard for a warrantless arrest where arresting officers had personal knowledge

In Delaware, a police officer is authorized to make a warrantless arrest for a felony when there is "reasonable ground to believe that the person to be arrested has committed a felony ..." "[R]easonable ground to believe," as used in that statute, has been construed to mean probable cause.[9]

Probable cause "is an elusive concept which avoids precise definition.... It lies somewhere between suspicion and sufficient evidence to convict."[10] Furthermore, "**[a]rresting officers** have 'probable cause' to make an arrest ... whenever the facts and circumstances **within the officers' knowledge** and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the arrestees had committed or were committing an offense."[11] The test involves a

---

[8] *Holden v. State*, 23 A.3d 843, 847 (Del. 2011) (citing *Jones v. State*, 745 A.2d 856, 861 (Del. 1999) (emphasis added).

[9] *Thompson v. State*, 539 A.2d 1055, 1056 (Del. 1988) (citing 11 *Del. C.* §1904(b)(1).

[10] *State v. Maxwell*, 624 A.2d 926, 929 (Del. 1993) (internal quotations omitted).

[11]*State v. Manley*, 706 A.2d 535, 538-39 (Del. Super. 1996) (internal citations omitted)(emphasis added); *see also, Carter v. State*, 814 A.2d 443, 445 (Del. 2002) ("For **an arresting officer** to have probable cause, **the officer's knowledge** must be sufficient for a prudent person to believe that an individual had committed or was committing an offense.") (emphasis added).

case-by-case analysis of the "totality of the circumstances."[12]  As such, "police are only required to present facts which suggest, when those facts are viewed under the totality of the circumstances, that there is a fair probability that the defendant has committed a crime."[13]

C.    **Legal standard for a warrantless arrest where arresting officer's justification in based on knowledge communicated by fellow officers.**

Arresting officers are "entitled to rely on information relayed to [them] through official channels when arresting [a suspect]."[14]  In other words, "[t]he arresting officer himself need not be apprised of the underlying circumstances which gave rise to a conclusion of probable cause."[15]  An arresting officer is free to "act in the belief that his fellow officer's judgment is correct."[16]  However, if "no officer **connected to the arrest** knows the facts which might justify it, [*i.e.*, probable cause] no officer

---

[12] *Maxwell,* 624 A.2d at 928; *see also Wong Sun v. United States*, 371 U.S. 471, 479 (1963) ("The quantum of information which constitutes probable cause—evidence which 'would warrant a man of reasonable caution in the belief' that a felony has been committed—must be measured by the facts of the particular case.").

[13] *Maxwell*, 624 A.2d at 930.

[14] *State v. Cooley*, 457 A.2d 352, 355 (Del. 1983).

[15] *Id*.

[16] *Id*.

exercises the judgment required as a substitute for judicial approval."[17]  In the absence of communication amongst a team of officers, the stop or arrest of an individual by an officer not possessing any such knowledge is improper.[18]

**D.    Detective Hurd had the personal knowledge sufficient to establish probable cause, but it was not relayed to the arresting officers.**

In the present case, the State's only witness was Detective Hurd. At the suppression hearing, the thrust of the State's case centered on the information obtained by Detective Hurd during his undercover investigation and surveillance of the Defendant.  In light of the aforementioned legal principles, the Court is persuaded that Detective Hurd had personal knowledge sufficient to support a finding of probable cause which **would have** allowed him, or someone at his direction, to arrest the Defendant without a warrant.[19]  However, Detective Hurd did not participate in

---

[17]  *Id*. (Emphasis added).

[18]  *Id.*

[19]  As indicated above, Detective Hurd had six years experience as an undercover drug investigator.  On the day in question, Detective Hurd was informed that the Defendant was dealing cocaine in the Dover area from a past-proven, reliable source. The Defendant was personally contacted by Detective Hurd and corroborated the fact that he was selling cocaine.  The Defendant himself provided Detective Hurd with his plan to travel to Smyrna and back to acquire the requested amount of cocaine. Meanwhile, Detective Hurd established surveillance of the Defendant and followed him on the trip to Smyrna as described.  Along the way, the Tahoe carrying the Defendant stopped for gas in Dover. By the time the Tahoe reached Smyrna, it stopped at two more gas stations– one of them twice–without getting gas.  On the last stop, the Defendant was observed entering a vehicle parked at an adjacent pump for a brief period of time.  After the meeting, the Defendant got back in the Tahoe and headed directly back to Dover.

11

the stop or subsequent arrest of the Defendant. Because the legality of any warrantless arrest hinges on what was known by the arresting officer at the time of the arrest, Detective Hurd's testimony can only be considered if that information was known by the arresting officers. In other words, if the information uncovered during Detective Hurd's investigation was never relayed to his fellow officers, it logically could not have formed a basis for the arresting officers' probable cause determination.

This aspect of the suppression motion is controlled by *State v. Cooley*.[20] In that case, the Delaware Supreme Court determined whether probable cause existed to arrest a Defendant and to administer an intoxilyzer test in a driving under the influence case. On the night in question, in *Cooley*, State Trooper Shamany arrived on scene and identified the Defendant as a driver of one of the vehicles involved in an accident.[21] At the scene, Trooper Shamany detected a strong smell of alcohol on the Defendant's breath and noted that he appeared to be incoherent.[22] Trooper Shamany helped him into a police car but did not place him under arrest or mention that he was being detained pending investigation into the accident.[23] Other officers

---

[20] *Cooley,* 457 A.2d at 353.

[21] *Id.*

[22] *Id.*

[23] *Id.* (The Court determined that the Defendant was not taken into custody or arrested at that time.).

arrived on site to aid in the investigation.

Witnesses on the scene were identified and directed to the nearby State Police Troop for statements. Two of the witnesses offered to take the Defendant with them to the Troop, and Trooper Shamany accepted their offer.[24] Sometime thereafter, one of the other officers who later arrived at the scene, Corporal McDerby, established radio contact with the Troop and directed the desk sergeant, Sergeant Thompson, to arrest the Defendant when he arrived for driving under the influence of alcohol.

Sergeant Thompson, at the Troop desk, had no firsthand knowledge to justify the Defendant's arrest. The focus of the Court's inquiry shifted to whether the directing officer, Corporal McDerby, had probable cause to order the arrest of the Defendant.[25] In carefully reviewing the facts, the Supreme Court held in that case that since Trooper Shamany (1) was the only officer possessing sufficient facts to reach a conclusion regarding probable cause and (2) she did not communicate them to either Thompson or McDerby, and furthermore (3) Trooper Shamany did not direct the Defendant's arrest, that there was not probable cause for such an arrest.[26] Because of the absence of communication between officers, it followed that the defendant was

---

[24] *Id.*

[25] *Id.* at 355.

[26] *Id.*

arrested without probable cause. Defendant's arrest at the Troop by an officer possessing neither facts shared with him by an officer regarding probable cause nor an order by a fellow officer possessing such information violated both the United States and Delaware Constitutions.[27]

The Delaware Supreme Court, in *Cooley*, also rejected the State's alternative argument that even if the arresting officer, Thompson, did not have knowledge of sufficient facts amounting to probable cause, Shamany's knowledge could nevertheless be imputed to Thompson since "the collective knowledge of an entire organization may be imputed to an individual officer...."[28] In rejecting that argument, while recognizing the viability of the collective knowledge doctrine, the Court explained that the

> State misunderstands that principle here. To say in the abstract that probable cause is to be evaluated on the basis of the collective information of the police ignores the underlying assumption—and factual reality—that there is some communication between those officers, who do know facts amounting to probable cause, and those who do not....[I]nformation scattered among various officers in a police department cannot substitute for possession of the necessary facts by a single officer related to the arrest. [29]

---

[27] *Id.* at 356 (internal citations omitted).

[28] *Id*. at 355 (quoting *State v. Schoenbneelt*, 368 A.2d 117, 119 (Conn. 1976)).

[29] *Id*. at 355-56 (quoting *Com. v. Gambit*, 418 A.2d 554, 557 (Pa. Super. Ct. 1980) *aff'd*, 462 A.2d 211 (Pa. 1983)).

14

The Court reasoned that the collective knowledge doctrine appropriately applied in situations where information held by several officers is actually (not constructively) pooled to make a probable cause determination.[30]

In summary, on a motion to suppress challenging the sufficiency of a stop or warrantless arrest for lack of probable cause, the State can satisfy its burden in one of two ways. The State can present evidence that the arresting officers themselves possessed the requisite knowledge to establish probable cause, or by introducing evidence that a fellow police officer with the requisite knowledge communicated that information to, and/or directed the officers on scene to make the arrest. Under the latter, the State must persuade the Court that the requisite knowledge was in fact communicated in order to rely upon the collective knowledge doctrine. Otherwise, it follows that the arresting officer acted without reasonable suspicion or probable cause.

Turning to the record in the case at hand, there is no evidence that the arresting officers had the benefit of Detective Hurd's information or that they arrested the Defendant at his direction. In fact, Detective Hurd adamantly maintained that he did not relay this information. The sole reference to any communication between the officers is found in Detective Hurd's police report, attached to Defendant's Motion

---

[30] *Id.*

15

as "Exhibit A." According to the report, while following the Defendant back to Dover, Detective Hurd "contacted Officer Anthony Digirolomo, Aaron Dickinson, Chris Bumgarner, Peter Martinek, Josh Boesenberg, Daniel Stagg, Thomas Hannon and K-9 partner Mina to making [sic] them aware of our location." Any potential inference suggesting that the aforementioned notation is evidence that Detective Hurd relayed the results of his undercover investigation to his fellow officers, or that it played a roll in the initial stop and events that followed, is contradicted by his testimony.

During the suppression hearing, the following exchange took place on direct-examination:

> Q.  All right.  On the traffic stop topic, what was the reason for the stop?
> A.  I believe Officer Martinek observed a seatbelt violation.
> Q.  Okay.

•　•　•

> Q.  Did Martinek tell you about the seatbelt violation?
> A.  Yes, he did.
> Q.  Was he the one that conducted the actual stop?
> A.  There were several officers there that conducted the traffic stop.
> Q.  Who lead them, though?
> A.  I believe it was Officer Martinek.
> Q.  Did you arrive immediately or shortly after the stop?
> A.  I did not go to the actual traffic stop location.  I observed it from an undisclosed location due to my undercover capacity.

On cross-examination, Detective Hurd further testified as follows:

16

Q. And was that your decision, to take him into custody at that time, or was that Officer Martinek?

A. There was never really a conversation that was taking place between he and I. You'd have to ask Officer Martinek on that scene because he might -- I do know that Officer Stagg observed him becoming extremely nervous, Mr. Holmes, and he was trying to use the bathroom at that time. So for safety concerns for the officers, I know he was taken into custody. I never said, take him into custody.

Q. Okay.

A. If that's what you're looking for.

Q. Okay. And you never had a conversation with any of the officers conducting the traffic stop regarding taking any of the parties present in the vehicle into custody at that time?

A. That's correct. I did not have any conversation.

•   •   •

Q. Okay. Who authorized the strip search of everyone in the vehicle?

A. Our supervisor at the time, Detective Aaron Dickinson.

Q. And do you recall the reasons that were requested to conduct that strip search?

A. I don't recall the reasonings of the –

Q. I'm sorry?

A. No, I don't recall the reasonings. Of the strip search?

Q. Yes.

A. I do not recall that. I don't know who -- I don't know who even to ask, to be honest with you, because I wasn't back to the police department yet when they brought everyone back.

As indicated above, while arresting officers "need not be apprised of the underlying circumstances which gave rise to a conclusion of probable cause" and are "entitled to rely on information relayed to [them] through official channels when arresting [a suspect]", a condition precedent requires that the arresting officers receive

17

the information in the first place.[31]  The Court is constrained by the record before it. In the present case, there is no evidence that the arresting officers were privy to the information discovered by Detective Hurd's undercover investigation,  As such, Detective Hurd's information could not have played a role in the arresting officer's reasonable suspicion or  probable cause determinations.

### E.    The traffic stop

Apart from the significant incriminating observations of Detective Hurd, the analyses independently may hinge on the legality of the specific traffic stop and the drug detection dog's reported alert and other observations of the Defendant at the scene of the stop.  In order to initiate a traffic stop, the stop must be justified at its inception by a reasonable articulable suspicion of criminal activity.  A police officer who observes a traffic violation–like the seat belt violation in this case–has probable cause to stop the vehicle and its occupants.[32]

The Defendant argues that the stop was pretextual, and therefore unlawful. *State v. Heath* held that when a stop is motivated by an unrelated purpose, and absent that purpose the stop would not have been made, that stop is pretextual and

---

[31]  *Cooley*, 457 A.2d at 355.

[32]  *Holden*, 23 A.3d at 847.

unlawful.[33]  However, despite opportunities to do so, the Delaware Supreme Court has declined to adopt the holding in *Heath*.  For instance, in *Turner v. State*, the Defendant also argued that the traffic stop was pretextual, and pursuant to the holding in *Heath*, that such a stop violates Article 1, Section 6 of the Delaware Constitution.[34] The Supreme Court in *Turner*, declined to follow *Heath*, noting "[t]hat decision was not appealed, and *Heath* has not been followed in any other Superior Court decisions. [The Defendant] cannot rely on *Heath* as a basis for his constitutional claim."[35] Instead, the Court focused on the reality of a violation, finding that,

> [the arresting officer] witnessed [the Defendant] in the front passenger seat of the Grand Marquis with an unfastened seatbelt, in violation of 21 *Del. C.* § 4802(a)(2).  These facts constitute a reasonable articulable suspicion that Tann, the driver, committed a traffic violation.  Therefore, the officers had probable cause to conduct a traffic stop.[36]

Without expressly rejecting *Heath*, the Court emphasized, "the Delaware Supreme Court recognizes an officer's discretion in conducting a traffic stop and does not rely on an officer's actual, subjective motives to determine the reasonableness of an officer's conduct."[37]

---

[33] *State v. Heath*, 929 A.2d 390, 402-03 (Del. Super. 2006).

[34] *Turner v. State*, 25 A.3d 774, 777 (Del. 2011).

[35] *Id.*

[36] *Id.*

[37] *Id.*

In light of *Turner v. State*, the Defendant's pretextual claim is rejected. Moreover, the facts of record in this case establish that any information possessed by Detective Hurd was not relayed to Officer Martinek. Accordingly, the stop could not be pretextual since there was no other alleged motive for the stop other than what was later relayed to the testifying officer to be a seatbelt violation.

Here, because the Court did not hear testimony or receive reports from the arresting officers, the record is devoid of any first hand account of the incident in question. The officer who made the stop did not testify. Likewise, the officers who arrested and searched the Defendant did not testify. Therefore, the Court must determine if the State is capable of meeting its burden strictly on the basis of the police officers' hearsay statements, as relayed by Detective Hurd, who was neither included in the stop or in contact with the stopping/arresting officers at the time of the stop.

**F.  Justification for the stop, arrest, and search based solely upon uncorroborated hearsay**

Before discussing whether the State can meet its burden for the initial traffic stop and subsequent arrest and search based entirely on the uncorroborated hearsay statements between officers, the Court finds it helpful to identify the relevant testimony. As is often the case with secondhand information, the breadth and

specificity of Detective Hurd's knowledge with regards to the circumstances surrounding the traffic stop is limited. On cross-examination, Detective Hurd testified as follows:

> Q. Okay. Do you have a copy of the traffic citation issued to Mr. Irvin?
> A. No, I do not. I did not issue the traffic citation, so I don't have a copy of it.
> Q. Would you be able to pull that up?
> A. I believe Officer Martinek could do that.
> Q. Okay. You do not have the capability to do that?
> A. I just got back on the road after six years. I don't know if I can do that or not.
> Q. Okay. How soon after this traffic stop did you and your partner, I guess, arrive at the traffic stop?
> A. We never arrived at the traffic stop location.
> Q. Okay.
> A. We observed the traffic stop location from an undisclosed location. If you want to get in specifics, it was approximately 50 yards from where it took place.
> Q. Okay. So you don't have any personal knowledge on the IDs that were taken from everyone in the vehicle and any warrant checks?
> A. That's correct. I don't have any knowledge of that.
> Q. Okay. Do you know if anyone had any outstanding warrants?
> A. I do not know that.
> Q. Okay. And then you testified that you don't feel comfortable testifying regarding the K-9 sniff or search of the vehicle?
> A. That's correct.
>
> • • •
>
> Q. Okay. So you would not be able to testify personally as to any behavior observed of anybody in the vehicle?
> A. No.
>
> • • •

21

Q. Okay. Have you had opportunity to review the K-9 activity use of force report?

A. No, I have not.

Q. Okay. Are you familiar with these?

A. No, I'm not.

Q. Okay. Do you know if they notate the weather conditions in that report?

A. I'm not familiar.


Q. Okay. Who authorized the strip search of everyone in the vehicle?

A. Our supervisor at the time, Detective Aaron Dickinson.

Q. And do you recall the reasons that were requested to conduct that strip search?

A. I don't recall the reasonings of the –

Q. I'm sorry?

A. No, I don't recall the reasonings. Of the strip search?

Q. Yes.

A. I do not recall that. I don't know who -- I don't know who even to ask, to be honest with you, because I wasn't back to the police department yet when they brought everyone back.

The only other reference to the circumstances surrounding the stop and later arrest was contained in Detective Hurd's police report. With the exception of a notation to "See Hannon's supplement for further"– which was not submitted into the record– Detective Hurd's report provides no additional evidence.

A suppression hearing is not a trial where strict rules of evidence must apply and where the concern is guilt beyond a reasonable doubt. The rules of evidence are relaxed, because "[t]rials are necessarily surrounded with evidentiary rules developed to safeguard men from dubious and unjust convictions. But before the trial we deal

22

only with probabilities that are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."[38] As such, during a suppression hearing, "[h]earsay information may form the basis of probable cause **if sufficiently corroborated by other facts within the officer's direct knowledge.**"[39]

Generally, when it comes to a probable cause determination at a suppression hearing, hearsay statements typically come from incriminating reports given to the police by informants or witnesses. In such scenarios, "[p]robable cause is not established solely by allegations of past reliability; something more is needed."[40] The same holds true when the hearsay statement is between two police officers. Put simply, the Court "may not accept a police officer's conclusion that probable cause for arrest exists without opportunity to examine in detail the grounds upon the basis of which he reached that conclusion."[41]

In the present case, all relevant evidence stemming from the stop is based on

---

[38] *Schramm v. State*, 366 A.2d 1185, 1192 (Del. 1976) (internal quotations omitted).

[39] *State v. Demby*, 1995 WL 717619, at *5 (Del. Super. Nov. 28, 1995) (emphasis added); *see also Brown v. State*, 249 A.2d 269, 272 (Del. 1968) (holding similarly, in the context of a violation of probation hearing, that pure hearsay, without some additional competent evidence, is not alone sufficient to support the finding of a violation).

[40] *Garner v. State*, 314 A.2d 908, 913 (Del. 1973).

[41] *Id*.

hearsay which is uncorroborated and lacking in detail. Following the initial stop for a seatbelt violation, Detective Hurd was told that ID checks were performed on the occupants of the vehicle. He did not know the results of those inquiries, or if any of the occupants had outstanding warrants. He was not familiar with any of the arresting officers' reports and did not feel comfortable testifying about K-9 procedures because he was not familiar with them. Additionally, as the stop unfolded, the Court could not ascertain what the arresting officers said, how the occupants responded, or what those officers were thinking. Without at least some corroborating details other than hearsay as to exactly what transpired, the Court is left solely with Detective Hurd's assumptions and conclusions. While the State is permitted to rely on hearsay in even large part to show that police action met the appropriate legal standard(s), under the circumstances of this case, its burden cannot be predicated entirely on hearsay.

## G. The Inevitable discovery doctrine does not apply in this case

In response to questions posed by the Court at the motion hearing, the State made the alternative argument that even if the Court found that the stop and subsequent investigation did comport with the Defendant's Constitutional rights, the inevitable discovery doctrine should apply to prevent exclusion. Based upon the record of this case, the Court disagrees.

The exclusionary rule acts "as a remedy for a violation of a defendant's right

24

to be free of illegal searches and seizures.  It provides for the exclusion from trial of any evidence recovered or derived from an illegal search and seizure."[42]  However, the Delaware Supreme Court has recognized occasions where "official misconduct should not fatally taint evidence that would have been discovered absent that official misconduct."[43]  Rather, "taint may be purged and the evidence may be admissible through one of the doctrinal exceptions to the exclusionary rule, such as the independent source doctrine, the inevitable discovery doctrine, the exigent circumstances doctrine, and the attenuation doctrine."[44]

Delaware accepts and consistently applies the inevitable discovery exception to the exclusionary rule.[45]  This exception provides that "evidence, obtained in the course of illegal police conduct, will not be suppressed if the prosecution can prove that the incriminating evidence **would have** been discovered through legitimate

---

[42] *Jones v. State*, 745 A.2d 856, 872-73 (Del. 1999) (citing *Mapp v. Ohio*, 367 U.S. 643 (1961); *Wong Sun v. United States*, 371 U.S. 471(1963)).

[43] *Id*. at 873.

[44] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1292 (Del. 2008) (internal citations omitted).

[45] *State v. Lambert,* 2015 WL 3897810 at *6-7 (Del. Super. June 22, 2015); *State v. Parks*, 95 A.3d 42, 51 (Del. Super. 2014) (citing *Cook v. State*, 374 A.2d 264, 267–68 (Del. 1977); *Martin v. State*, 433 A.2d 1025 (Del. 1981); *Rew v. State*, 1993 WL 61705 (Del. Feb. 25, 1993); *Hardin v. State*, 844 A.2d 982 (Del. 2004); *Thomas v. State*, 8 A.3d 1195 (Del. 2010); *Roy v. State*, 62 A.3d 1183 (Del.2012)).

means in the absence of official misconduct."[46]

In the present case, the Court is not persuaded that the incriminating evidence **would** have been discovered through legitimate means in the absence of official misconduct. There is a significant difference between what could have happened and what would have happened. According to Detective Hurd, the investigation into the Defendant was a month-long investigation. On cross-examination, Detective Hurd testified as follows:

> Q. Okay. If Officer Martinek had not observed an alleged traffic violation, was your plan just to conduct surveillance all day on Mr. Holmes?
> A. I probably would have watched him a little bit longer just to see if he would have went back to that location.
> Q. What location?
> A. To the West Division Street area.
> Q. Okay.
> A. And depending on what I saw, I might have had someone stop him based upon what I saw. I mean, **I can't speculate after the traffic stop**, but the seatbelt violation was observed, so that's what we went with.

If a plan certain was set in motion to apprehend the Defendant had the traffic stop not occurred, it cannot be found in the record. Detective Hurd's testimony establishes that it was uncertain as to whether an arrest that day would have occurred, or whether his month-long undercover investigation would have continued. Perhaps Detective Hurd would have arrested Defendant upon his return to Dover, or on the

---

[46] *Id*. (quoting *Cook*, 374 A.2d at 267–68) (emphasis added).

26

other hand, the undercover officer may have set up additional buys in an attempt to apprehend Defendant's supplier. Speculation does not establish inevitability. There was no evidence in the hearing permitting even an inference that an arrest was imminent. Accordingly, the inevitable discovery doctrine is not applicable as a means to validate the stop of the Defendant or his subsequent arrest and search. Based upon the aforementioned, it follows that all evidence obtained as a result of that illegal search and seizure is hereby suppressed.

## V. CONCLUSION

For all of the reasons listed above, the Defendant's Motion to Suppress is **GRANTED**.

IT IS SO ORDERED.


 /s/Jeffrey J Clark 
Judge

27