**Michael HOLDEN, Defendant Below, Appellant,**

**v.**

**STATE of Delaware, Plaintiff Below, Appellee.**

No. 345, 2010.

Supreme Court of Delaware.

Submitted: March 23, 2011.
Decided: June 20, 2011.

Eugene J. Maurer, Jr., Wilmington, Delaware for appellant.

Maria T. Knoll and Timothy J. Donovan, Jr. (argued), Department of Justice, Wilmington, Delaware for appellee.

Before STEELE, Chief Justice, HOLLAND and JACOBS, Justices.

STEELE, Chief Justice:

On June 30, 2010 after a stipulated bench trial, the trial judge found Michael Holden guilty of Carrying a Concealed Deadly Weapon. The trial focused on the propriety of the police seizure of the weapon before Holden "carried." Because the objective evidence failed to establish a reasonable belief that Holden was armed and dangerous before the police searched him and seized the weapon, the trial judge erroneously denied Holden's motion to suppress the illegally obtained evidence. We therefore reverse.

## FACTS AND PROCEDURAL HISTORY

On January 24, 2010, Officer Fleming and Officer Ham of the Wilmington Police Department were patrolling their district in Wilmington near 4th Street and Rodney Street. The officers observed a Ford Bronco with three black males inside make a left hand turn onto 5th Street without using a turn signal. Officer Fleming ran a registration check on the Bronco, which had a Pennsylvania license plate, and learned that the license plate was registered to a female Pennsylvania resident, Haile Vicks. Fleming and Ham immediately suspected that the Bronco was stolen. After reconfirming, the license plate information with the data center, the officers activated their emergency equipment and put their car in reverse to follow the Bronco.

When the officers reached the Bronco, it had already stopped and pulled off the road, and the front passenger, Michael Holden, was outside the vehicle and walking away from the area. The back seat passenger, Jeremie Campbell, was getting out of the vehicle to follow Holden. Fleming and Ham got out of the police car and ordered Holden and Campbell back to the Bronco. Both men continued walking and the officers ordered them back a second time. After returning to the Bronco, the officers ordered Holden and Campbell back inside the Bronco "to control the scene."

After all three passengers were "secure" in the Bronco, Ham approached the driver side of the Bronco and Fleming approached the passenger side. The officers obtained proper identification from all 3 occupants and verified that none of them had any outstanding warrants or capiases.[1] Upon returning to the Bronco, Ham questioned David Johnson about the ownership of the vehicle, because Johnson was unable to provide the vehicle's registration. Simultaneously, Fleming went to the passenger side of the vehicle, followed by an Officer Tynes, who had just arrived at the scene.[2] Fleming then asked Holden if he had any weapons or contraband on his person. Holden answered no. Fleming then ordered Holden out of the vehicle and told him to put his hands on the back of the vehicle, where Officer Tynes was wait-

---

1. Hearing transcript at 19.

2. Hearing transcript at 23.

ing.[3] Tynes then patted Holden down. During that pat down, Tynes found a gun tucked in Holden's front waistband.

The officers arrested Holden and the State indicted him for carrying a concealed deadly weapon. Holden moved to suppress the evidence obtained as a result of the pat down search. The Court held a suppression hearing on May 20, 2010. On June 1, 2010, a judge denied Holden's motion to suppress without explanation.[4] After a bench trial, the trial judge found Holden guilty of CCDW and sentenced him immediately. Holden appeals.

## DISCUSSION

### A. The Trial Judge Erroneously Denied Holden's Motion to Suppress Because The Police Officers Had No Reasonable Articulable Suspicion That Holden Was Armed and Presently Dangerous When the Police Patted Him Down and Discovered the Weapon.

On appeal, Holden claims the trial judge erroneously denied his motion to suppress the firearm because the police lacked a reasonable and articulable suspicion that he was armed and dangerous when they conducted the pat down search. We review a trial court's denial of a motion to suppress for abuse of discretion.[5] To the extent the claim of error implicates questions of law; however, the standard of review is *de novo.*[6] We review a trial judge's factual findings to determine whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous.[7] Here, the trial judge denied the suppression motion after an evidentiary hearing without making any factual findings and without supplying a written or transcribed oral decision for review. Our case law mandates that a judge make factual determinations and supply a legal rationale for a judicial decision as a matter of law.[8] Failure to do so may be an abuse of discretion.[9] As we have acknowledged before, "[w]e are mindful of the tremendous time burdens on our trial courts. But it is part of a trial judge's adjudicative responsibili-

---

**3.** Hearing transcript at 42.

**4.** Super. Ct. Order (June 1, 2010).

**5.** *Lopez–Vazquez v. State*, 956 A.2d 1280, 1284 (Del.2008).

**6.** *Id.* at 1284–85.

**7.** *Woody v. State*, 765 A.2d 1257, 1261 (Del. 2001).

**8.** *Cannon v. Miller*, 412 A.2d 946, 947 (Del. 1980) (citing *Walsh v. Hotel Corp. of America*, 231 A.2d 458, 460 (Del.1967) ("[T]his Court specifically noted the then governing Canon of Judicial Ethics No. 19, which read in pertinent part:

In disposing of controverted cases, a judge should indicate the reasons for his action in an opinion showing that he has not disregarded or overlooked serious arguments of counsel. He thus shows his full under-

standing of the case, avoids the suspicion of arbitrary conclusion, promotes confidence in his intellectual integrity and may contribute useful precedent to the growth of the law.

While the current canons contained in The Delaware Judges' Code of Judicial Conduct purposely adopt the broader and more general approach now recommended by the American Bar Association, this Court made it specifically clear that it is part of a trial judge's adjudicative responsibilities to state the reasons for his action, no matter how briefly. Canon 3 requires that a judge be faithful to the law and maintain professional competence. The supplying of reasons for a judicial decision is part of established law of this State and also a required incident of the (maintenance of) professional competence.") (internal quotation marks and citations omitted)).

**9.** *Cannon v. Miller*, 412 A.2d at 947; *accord Storey v. Camper*, 401 A.2d 458, 466 (Del.

ties 'to state the reasons for his action, no matter how briefly.' "[10]

■■■■ Generally, police officers can stop an individual for investigatory purposes if they have a reasonable articulable suspicion that the person is committing, has committed, or is about to commit a crime.[11] Reasonable suspicion is defined as the officer's ability "to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrants the intrusion."[12] In determining whether reasonable articulable suspicion exists, we "must examine the totality of the circumstances surrounding the situation as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[13] That said, such an officer is justified in "frisking" an individual only if the officer has a reasonable articulable suspicion that the individual is armed and presently dangerous.[14]

■■■■ A police officer who observes a traffic violation has probable cause to stop the vehicle and its driver.[15] During a lawful traffic stop, a police officer may order both the driver and passengers out of the vehicle pending completion of the traffic stop.[16] The scope and duration of the detention must be reasonably related to the initial justification for the traffic stop.[17] A police officer may not conduct a pat down search of a person during a traffic stop unless the officer has reasonable suspicion that the person subject to the frisk is armed and dangerous.[18] This reasonable suspicion standard is the same standard that is applied to a pedestrian reasonably suspected of criminal activity under *Terry v. Ohio.*[19] With these principles in mind, we examine whether, under the totality of the circumstances here, the police possessed a reasonable articulable suspicion to stop and frisk Holden.

Holden concedes that the initial vehicle stop was valid.[20] We agree. The record shows that the officers pulled over the Bronco after observing the driver make a turn without signaling and that a license plate check revealed a fictitious tag. After running the license plate, the officers were suspicious that the vehicle may be stolen.[21] Based on these observations, the officers had probable cause to stop the Bronco for the traffic violations and inquire into the vehicle's ownership.

1979), *Husband M. v. Wife D.*, 399 A.2d 847, 848 (Del.1979).

10. *Husband M. v. Wife D.*, 399 A.2d 847, 848 (Del.1979) (quoting *Ademski v. Ruth*, 229 A.2d 837 at n. 1 (Del.1967)).

11. 11 *Del. C.* § 1902; *see also State v. Henderson*, 892 A.2d 1061, 1064 (Del.2006) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

12. *State v. Henderson*, 892 A.2d 1061, 1064–1065 (Del.2006).

13. *Jones v. State*, 745 A.2d 856, 861 (Del. 1999) (citing *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

14. *State v. Henderson*, 892 A.2d 1061, 1064 (Del.2006) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

15. *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

16. *Maryland v. Wilson*, 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).

17. *Caldwell v. State*, 780 A.2d 1037, 1046 (Del.2001).

18. *Arizona v. Johnson*, 555 U.S. 323, 129 S.Ct. 781, 784, 172 L.Ed.2d 694 (2009).

19. 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

20. Op. Br. at 8.

21. Hearing transcript at 7.

Holden was already outside the vehicle when the officers arrived.[22] With tasers drawn, Fleming and Ham ordered Holden back to the vehicle, and after the second order, Holden complied.[23] Even though Holden was detained before the police ordered him back inside the vehicle,[24] neither officer asked Holden any questions about his identity, his address, or his purpose for being there.[25] Fleming did not notice any bulge on Holden's clothing; and in fact, did not even believe Holden was armed and dangerous before ordering him to get back in the vehicle.[26] Fleming testified that had he thought Holden armed and dangerous, he would have frisked him before putting him back in the vehicle.[27]

This Court cannot, however, conclude from the above facts that the police had the requisite reasonable articulable suspicion to frisk Holden when he was ordered out of the vehicle. There are insufficient articulable facts that when viewed objectively, suggest Holden was armed. After identifying the vehicle's occupants, the police determined that none of them had any outstanding warrants. When the officers returned to the vehicle, there were three police officers and three vehicle occupants.

After Johnson, the driver, was unable to answer questions regarding the vehicle's ownership, Ham asked him to step out of the vehicle.[28] Simultaneously, the police ordered Holden out of the vehicle and Tynes frisked him.[29] The record reflects that the police never questioned Holden about being out that night or about the vehicle's ownership.[30] The objective facts at this point were: (1) Holden was a passenger in a vehicle with a fictitious tag; (2) Holden walked away from the vehicle when the police arrived; (3) Holden returned to the vehicle; (4) the police ordered Holden inside the vehicle without frisking him for weapons; (5) the police saw no weapons in the vehicle or any bulge on Holden's body indicating a weapon; (6) the police frisked Holden immediately after ordering him from the vehicle before they gathered any additional facts.

The State suggests that because the driver could not answer questions about the car it became more likely that the car was stolen, and that therefore, the passengers were likely armed. We disagree. Based on the objective facts, we cannot extrapolate from the fact of a fictitious tag alone that (i) a car theft occurred[31] and

22. Hearing transcript at 10.

23. Hearing transcript at 14.

24. *State v. Rollins*, 922 A.2d 379, 383 (Del. 2007) (holding that a stop occurs when a police officer displays conduct that would communicate to a reasonable person that they are not at liberty to leave).

25. 11 *Del. C.* § 1902 reads in pertinent part:
 (a) A peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination.

26. Hearing transcript at 37–38, 39.

27. Hearing transcript at 40.

28. Hearing transcript at 41.

29. Officer Fleming testified that Holden was the first person frisked but Officer Tynes testified that he only frisked Holden after observing Officer Ham frisk the driver. See Appendix to Ans. Br. at 43 and 65. This discrepancy creates a credibility issue that should have been resolved by the trial judge's opinion. Fortunately, resolution of this credibility issue is not necessary to our decision on appeal. Nonetheless, this issue highlights another important reason for the trial judge to make findings of fact on the record.

30. Hearing transcript at 41.

31. After running the registration the police never contacted the data center to determine whether the vehicle was stolen. Hearing transcript at 32–33. In fact, the police report

that (ii) the occupants must be armed and dangerous. Even a confirmed vehicle theft, under the Delaware code, does not require the use of a weapon.[32] Indeed, if a weapon were involved, the crime would be carjacking in the first degree.[33] The record reflects that the police were investigating a possible stolen car because the license plate did not match the vehicle—not a possible carjacking. A fictitious tag may suggest one of many scenarios, such as a stolen vehicle, a stolen tag, or a mistake. A fictitious tag, or suspected stolen vehicle—without more—does not give rise to reasonable suspicion that the car's occupants might be armed and dangerous.

■ We agree that it is "possible for factors, although insufficient individually, to add up to reasonable suspicion, but it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation."[34] Here, the State contends that Holden's initial attempt to walk away from the vehicle and his failure to return to the vehicle

after the initial command constituted leaving the scene or a kind of "furtive" gesture. But, a careful review of the record indicates that the Bronco stopped and pulled off the road before the police activated their lights and initiated the stop.[35] Officer Fleming testified that he did not see Holden get out of the vehicle and that Holden was approximately two feet away from the Bronco when the officers arrived.[36] Thus, as a factual matter, this Court is not persuaded that Holden either left or attempted to leave the scene to avoid contact with the police. Moreover, merely leaving the scene upon approach or sighting of the police is not, in itself, suspicious conduct.[37] In our view, Holden did not intentionally evade the police because, he returned to the vehicle and fully cooperated with the investigation. Nothing in the record suggests otherwise.

■ While recognizing the importance of officer safety during a traffic stop,[38] a pat down still requires articulable facts specific to the person frisked.[39] General-

---

indicates that the police did not charge Johnson, Holden, or Campbell with vehicle theft. The driver, Johnson, was issued a traffic summons for fictitious registration, registration card not in possession, and failure to signal.

**32.** 11 *Del. C.* § 841 A(a)

A person is guilty of theft of a motor vehicle when the person takes, exercises control over or obtains a motor vehicle of another person intending to deprive the other person of it or appropriate it.

**33.** 11 *Del. C.* § 836(a)(4)

(a) A person is guilty of carjacking in the first degree when the person knowingly and unlawfully takes possession or control of a motor vehicle from another person or from the immediate presence of another person by coercion, duress or otherwise without the permission of the other person ...
(4) While in possession or control of such vehicle or while in the course of taking or attempting to take possession or control of such vehicle the person displays what ap-

pears to be a deadly weapon or represents by word or conduct that the person is in possession or control of a deadly weapon.

**34.** *Harris v. State,* 806 A.2d 119, 128 (Del. 2002).

**35.** Hearing transcript at 8.

**36.** Hearing transcript at 10.

**37.** *State v. Rollins,* 922 A.2d 379, 386 (Del. 2007).

**38.** See *Robertson v. State,* 596 A.2d 1345, 1353 (Del.1991) (holding the officer had the requisite reasonable suspicion to conduct a Terry frisk for officer safety because he was alone in a high crime area, he was outnumbered three to one, and the defendant was seated in the suspected stolen vehicle).

**39.** *Ybarra v. Illinois,* 444 U.S. 85, 94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1980).

ized cursory searches are impermissible.[40] Here, the police were unable to articulate facts that reasonably suggested Holden posed a threat to officer safety. Fleming testified that the passengers were ordered back inside the vehicle to control the scene. Giving due respect to officer safety, however, we do not find this argument credible. It is inconsistent to place a suspect inside a vehicle—where hands and body are out of sight—when the police genuinely believe that officer safety is an issue. If genuine safety issues exist during a traffic stop, the officer would frisk the suspect for weapons *ab initio* rather than place the suspects inside the vehicle and by so doing give them easy access to weapons. It is also inconsistent for officers to leave the suspects unattended in the vehicle while verifying the suspects' identifications, if in fact the officers reasonably feared for their safety.

 Nor does the mere incantation of "officer safety" provide the necessary reasonable suspicion for a frisk. More importantly, the constitution does not condone routine pat downs without any reasonable suspicion that the officer's personal safety requires it.[41] Allowing routine pat down searches "would eviscerate *Terry's* requirement that the pat down be based on particularized suspicion developed by the officer with respect to each individual suspect."[42] Here, Tyne's sole basis for frisking Holden was that it was his policy to frisk a subject automatically before questioning him.[43] Our analysis does not depend on whether the officer subjectively fears for his safety. The relevant inquiry is "whether a reasonably prudent man in the circumstances could be warranted in the belief that his safety or that of others was in danger."[44] Generally, a pat down is justified based on the nature of the suspected crime, a sudden reach by the individual, a bulge, or a history with the specific individual. None of these factors were present here.

Nothing in the record indicates that this was a high crime area. Holden cooperated with the investigation and provided proper identification. At the time of the search, the police were not outnumbered. Although in some circumstances, the reason for the investigatory stop may also provide the basis for a frisk that is not the case here. The police in this case had no reason to frisk Holden except for their hunch that Holden was a passenger in a stolen vehicle. We conclude that the police were not justified in frisking Holden because the police failed to articulate any reasonable concern for their safety, nor would a reasonable person have believed that Holden

**40.** *Id.*

**41.** *State v. Dollard*, 788 A.2d 1283, 1288 (Del.Super.2001).

**42.** *Id.* at 1289.

**43.** During the suppression hearing, Officer Tynes testified:
Q: So without any knowledge whatsoever, nobody tells you to frisk Mr. Holden, you just go ahead and frisk him; is that right?
A: Right.
Q: So you had no reason to believe that he had done anything or been involved in any kind of criminal activity? You just do that for your own safety?
A: I do that whenever I'm dealing with a person. I don't know them. They don't know me. I don't know what he's capable of, so I'm going to give him a pat-down just in case he has something on him that can harm me.
Q: So irrespective of what you know or don't know, you just do that automatically in all cases to protect yourself; is that right?
A: Yes.
Q: That's your policy?
A: Yes.
Hearing transcript at 70–71.

**44.** *Terry*, 392 U.S. at 27, 88 S.Ct. 1868.

was armed and dangerous under the circumstances. Because under the totality of the circumstances, the police did not have an objectively reasonable belief that Holden was armed and presently dangerous, the pat down was illegal and any evidence seized must be suppressed.

## CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is REVERSED.