# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,   )
           )
           )
**v.**         )  **I.D. No. 2103011314**
           )  **Cr. A. Nos. IN21-05-0153, etc.**
           )
**AARON A. JACKSON**   )

Submitted: September 12, 2022
Decided:  December 28, 2022
Written Opinion Issued:  January 23, 2023
Corrected:  January 24, 2023

## <u>MEMORANDUM OPINION & ORDER</u>

*Upon Defendant Aaron Jackson's Motion to Suppress*,
**DENIED**.

Jillian L. Schroeder, Esquire, Deputy Attorney General, DEPARTMENT OF JUSTICE, Wilmington, Delaware, for the State of Delaware.

John S. Edinger, Jr., Esquire, Assistant Public Defender, OFFICE OF DEFENSE SERVICES, Wilmington, Delaware, for Defendant Aaron Jackson.

**WALLACE, J.**

Defendant Aaron Jackson has been indicted for Possession of a Firearm by a Person Prohibited and other related offenses. He's vigorously prosecuted a motion to suppress the gun and drugs the State intends to use at trial. But, because the police had a reasonable articulable suspicion that Mr. Jackson was committing or was about to commit a criminal offense, they properly stopped the car in which he was travelling and thereafter properly discovered the gun and drugs. So, Mr. Jackson's motion to suppress that evidence must be **DENIED**.

## I. MR. JACKSON'S MOTION TO SUPPRESS

Mr. Jackson has moved to suppress evidence obtained when the vehicle he was riding in was stopped; he says the police had no valid reason to stop the vehicle. In his view, a police officer's observation that he was rolling a marijuana cigar in the front seat of the moving vehicle did not reasonably indicate that he was engaged in illegal activity. In turn, Mr. Jackson says that officer's observation of his alleged illegal conduct absent more—like a traffic violation or other criminally suspicious behavior on the part of himself or the vehicle's other passengers—was not sufficient to warrant the pull-over. Mr. Jackson insists those deficiencies, coupled with key investigating officer, Wilmington Police Department Corporal Jhalil Akil's credibility issues, should be more than enough to find the vehicle's initial detention was unconstitutional. Accordingly, he seeks to suppress all evidence gathered thereafter.

## II. APPLICABLE LEGAL STANDARDS

### A. GENERAL CONSTITUTIONAL STANDARDS APPLICABLE TO THE SEIZURE QUESTION POSED HERE

In Delaware, individuals are protected from unreasonable seizures by both the Fourth Amendment to the United States Constitution and Article I, § 6 of the Delaware Constitution.[1] "But it is only those searches and seizures that are 'unreasonable' that run afoul of" either or both.[2]

"When law enforcement directs a driver to stop her car, the State has 'seized' the car and its occupants, and the protections of the Fourth Amendment [and Article I, § 6] apply."[3] "In the traffic stop context, . . . a seizure is reasonable when a law enforcement officer conducts a brief investigatory traffic stop based on reasonable and articulable suspicion of criminal activity."[4] The legitimacy of motor vehicle stops is tied to the existence of a "reasonable suspicion that a legal violation has occurred"[5] or, perhaps more aptly here, is about to occur.[6]

---

[1]   U.S. CONST. amend. IV; DEL. CONST. art. I, § 6.

[2]   *West v. State*, 143 A.3d 712, 716 (Del. 2016).

[3]   *Id.*; *Tann v. State*, 21 A.3d 23, 26 (Del. 2011) ("Under the Fourth Amendment of the United States Constitution and Article I, § 6 of the Delaware Constitution, a traffic stop is a seizure of the vehicle and its occupants." (citation omitted)).

[4]   *West*, 143 A.3d at 716 (citing *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968)).

[5]   *State v. Prouse*, 382 A.2d 1359, 1361 (Del. 1978).

[6]   *See Holden v. State*, 23 A.3d 843, 847 (Del. 2011) ("Generally, police officers can stop an individual for investigatory purposes if they have a reasonable articulable suspicion that the person is committing, has committed, or is about to commit a crime." (citations omitted)); *Quarles v. State*, 696 A.2d 1334, 1337 (Del. 1997) (Such police-citizen encounters "require[] that the officers

"A 'reasonable suspicion' exists when the officer can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion.'"[7] "[T]he quantum of evidence necessary for reasonable suspicion is less than that which is required for probable cause to arrest."[8] Indeed, while a mere "hunch" does not constitute reasonable suspicion,[9] the level of suspicion required is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less demanding than that for probable cause."[10]

"Police officers are permitted to stop a motor vehicle based on a police officer's reasonable suspicion that the operator or occupant of the vehicle has committed or is committing a violation of the law."[11] The existence of reasonable suspicion is "evaluated in the context of the totality of the circumstances to assess whether the detaining officer had a particularized and objective basis to suspect

---

have a reasonable articulable suspicion that the suspect has committed or is about to commit a crime.").

[7] *Juliano v. State*, 254 A.3d 369, 388 (Del. 2020) (alteration in original) (citing *Downs v. State*, 570 A.2d 1142, 1145 (Del. 1990)).

[8] *Id.* (quoting *Coleman v. State*, 562 A.2d 1171, 1174 (Del. 1989)).

[9] *United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("The officer, of course, must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.") (cleaned up); *Woody v. State,* 765 A.2d 1257, 1262 (Del. 2001) ("An officer's subjective impressions or hunches are insufficient." (citation omitted)).

[10] *Sokolow*, 490 U.S. at 7 (citation omitted); *Quarles*, 696 A.2d at 1337.

[11] *State v. Mayfield*, 2021 WL 4188725, at *2 (Del. Super. Ct. Sept. 14, 2021) (citations omitted).

criminal activity."[12] That totality giving rise to the vehicular stop is "viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with the officer's subjective interpretation of those facts."[13] And when determining whether reasonable suspicion exists to justify a detention, a court might rightly defer to the experience and training of a law enforcement officer.[14]

## B. EVIDENTIARY STANDARDS APPLICABLE TO THE SEIZURE QUESTION POSED HERE

"The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop . . . and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion."[15] Accordingly, the suppression hearing judge's first responsibility is to determine the historical facts from the testimony presented, physical or documentary evidence, and inferences from other facts.[16] Among other things, "the trial judge, sitting as the finder of fact at a pretrial suppression hearing, determines witness credibility."[17] And "when presented with

---

[12] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1288 (Del. 2008) (citing cases).

[13] *Id.* (citations omitted).

[14] *Woody,* 765 A.2d at 1262 (citations omitted).

[15] *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

[16] *Lopez v. State*, 861 A.2d 1245, 1248-49 (Del. 2004) (citing *Ornelas*, 517 U.S. at 696 and *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985) (noting that: "The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise.")).

[17] *Turner v. State*, 957 A.2d 565, 570-71 (Del. 2008) (citations omitted).

differing accounts of historical facts, 'it is the [suppression hearing judge's] role to resolve the conflicts in witnesses' testimony and weigh their credibility.'"[18]  To do so, the judge might consider any existing objective evidence.[19]  She might also consider whether certain proffered testimony is so "inconsistent or implausible on its face that a reasonable factfinder would not credit it."[20]  In the end though, when weighing the evidence and finding facts, the suppression hearing judge may "reach any 'inferences, deductions and conclusions to be drawn from the evidence.'"[21]

## III. DISCUSSION

### A. THE COURT EVALUATED CPL. AKIL'S CREDIBILITY IN MAKING THE FINDINGS OF FACT UNDERPINNING THIS SUPPRESSION RULING.

These suppression proceedings meandered an uncustomary path.  Resultingly, this writing must take a not-oft-travelled detour to address a unique witness credibility issue posed here.

The vehicle that Mr. Jackson was riding in on March 19, 2021, was stopped

---

[18]  *Diggs v. State*, 257 A.3d 993, 1006 (Del. 2021) (alteration added) (quoting *Johnson v. State*, 2007 WL 1575229, at *1 (Del. May 31, 2007)).  *See Anderson*, 470 U.S. at 575 (explaining the "greater deference [accorded] to the trial court's findings [based on determinations regarding the credibility of witnesses]; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said" (citation omitted)).

[19]  *Anderson*, 470 U.S. at 575.

[20]  *Id.*

[21]  *United States v. France*, 414 F. Supp. 3d 747, 750 (W.D. Pa. 2019) (quoting *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)).  And a suppression hearing judge's factual findings "can be based upon physical evidence, documentary evidence, testimonial evidence, or inferences from those sources jointly or severally." *State v. Abel*, 68 A.3d 1228, 1232 (Del. 2012) (quoting *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 491 (Del. 2000)).

by WPD officers based solely on Cpl. Akil's visual observation of Mr. Jackson rolling and licking what appeared to be a marijuana cigar in the front seat.[22] Because that seizure was warrantless, the State has the burden of proving the validity of the police's action.[23] To do so, the State called as its only suppression witness Cpl. Akil—the officer who purportedly made the observation just mentioned—to testify as to what he saw, his interpretation thereof, and his actions related to Mr. Jackson's stop and seizure.

### 1. The State's *Brady* Disclosure

Before Mr. Jackson's preliminary hearing, the State notified him that Cpl. Akil was placed on the Delaware Department of Justice ("DelDOJ")'s "*Brady* list"[24] due to his conduct in *State v. Deonte Robinson*—a 2020 case in which Cpl. Akil made certain averments in an arrest warrant and offered certain testimony at a preliminary hearing that were not factually accurate.[25] At bottom, both sides agree that in *Robinson*, Cpl. Akil used the phrases or terms "received information

---

[22] Suppression Hr'g Tr. at 8, 32, *State v. Aaron A. Jackson*, ID No. 2103011314 (Del. Super. Ct. Nov. 12, 2021) (D.I. 18) (hereinafter cited as "*Jackson* Supp. Hr'g Tr. at __").

[23] *Juliano*, 254 A.3d at 392 (quoting *Hunter v. State*, 783 A.2d 558, 560 (Del. 2001)).

[24] *See Michael v. State*, 529 A.2d 752, 755 (Del. 1987), *abrogated on other grounds*, *Stevens v. State*, 129 A.3d 206 (Del. 2015), (citing *Brady v. Maryland*, 373 U.S. 83 (1963)) (defining *Brady* material as "evidence favorable to the defendant and material either to guilt or punishment"); State's Ans. to Supp. Mot. at 11 n.34, *State v. Aaron A. Jackson*, ID No. 2103011314 (Del. Super. Ct. Nov. 9, 2021) (D.I. 10) (As defined by the State here: "The [Del]DOJ 'Brady List' is an internal working document for prosecutors to assist them in satisfying their constitutional obligations.").

[25] Preliminary Hr'g Tr. at 5, 13, *State v. Aaron A. Jackson*, ID No. 2103011314 (Del. Com. Pl. May 5, 2021) (Del. Super. Ct.—D.I. 2) (hereinafter cited as "*Jackson* Prelim. Hr'g Tr. at __"); *Jackson* Supp. Hr'g Tr. at 25-27, 35.

from a confidential informant" or "was notified by a confidential informant" to describe how he obtained certain information when, in fact, Cpl. Akil gathered such via his own direct online observation of suspects while he was logged into his own camouflaged social media account.[26]

That all was divulged during the *Robinson* proceedings[27] and eventually investigated for internal discipline by the Wilmington Police Department with no finding of actionable misconduct.[28] Even still, the DelDOJ disclosed Cpl. Akil's activity in the *Robinson* case here to Mr. Jackson.[29] The reason: It's long been understood that impeachment evidence falls within the *Brady* rule just the same as more direct exculpatory evidence.[30] And "[u]nder *Brady* and its progeny, the State's failure to disclose exculpatory and impeachment evidence that is material to the case

---

[26] *Jackson* Supp. Hr'g Tr. at 17-18, 20, 24, 27.

[27] Preliminary Hr'g Tr. at 6-9, 16-18, *State v. Deonte L. Robinson*, ID No. 2008006367 (Del. Com. Pl. Sept. 14, 2020) (Ex. C., Def. Mot. to Compel, *State v. Aaron A. Jackson*, ID No. 2103011314 (Del. Super. Ct. Jan. 3, 2022) (D.I. 20)) (hereinafter cited as "*Robinson* Prelim. Hr'g Tr. at ___"); *Jackson* Supp. Hr'g Tr. at 25-27, 35.

[28] *Jackson* Prelim. Hr'g Tr. at 13-17 (WPD Office or Professional Standards Sergeant: "There was an investigation. The official charge was inaccurate reporting regarding Corporal Akil and it was found that it was unsubstantiated. So it did not occur in our eyes . . ."); *see also* State's Mot. *in Limine* at 3, *State v. Aaron A. Jackson*, ID No. 2103011314 (Del. Super. Ct. Oct. 27, 2021) (D.I. 7).

[29] *See Jackson* Prelim. Hr'g Tr. at 5, 13-17; *see also* State's Mot. *in Limine* at 3; State's Ans. to Supp. Mot. at 15; *Jackson* Supp. Hr'g Tr. at 25-27, 35.

[30] *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Michael*, 529 A.2d at 756 ("Evidence which the defense can use to impeach a prosecution witness . . . as well as exculpatory evidence, falls within the *Brady* rule." (citation omitted)); *id.* at 756 n.9 (observing that: "In 1807, the United States Supreme Court ruled that prior to trial a defendant must have access to impeachment evidence in the government's possession." (citing *United States v. Burr*, 25 Fed. Cas. 30, 36 (No. 14,692(d)) (CCVA 1807))).

violates a defendant's due process rights."[31]

### 2. Cpl. Akil and the *Robinson* Case

It seems that at some point in 2019 or 2020, certain WPD investigators came to use disguised social media accounts to surveil possible criminal activity that wrongdoers might be broadcasting live on certain digital platforms.[32] Those officers—not wanting to burn their online undercover identities—sought advice through the WPD chain-of-command from the DelDOJ.

Apparently, in answer to this inquiry regarding such use, a Deputy Attorney General sent an e-mail to a WPD Lieutenant that read, in pertinent part:

> [Lieutenant]
>
> Attached is our advice regarding social media posts with guns.
>
> [Deputy Attorney General]
>
>                 *            *            *
>
> 5. <u>Citing to Instagram as a "confidential informant" in warrants</u>
>
> It is acceptable to list information obtained from Instagram as coming from a confidential informant.[33]

There was no citation to authority or other basis provided for the advice given in this e-mail, just the simple statement quoted here.

---

[31] *Wright v. State*, 91 A.3d 972, 987 (Del. 2014) (citations omitted).

[32] *Robinson* Prelim. Hr'g Tr. at 6-8; *Jackson* Supp. Hr'g Tr. at 25-27.

[33] DelDOJ E-mail to WPD (Feb. 5, 2020), *Jackson* Supp. Hr'g, Ct.'s Ex. 1 (alterations in brackets added); *see Jackson* Supp. Hr'g Tr. at 19-24.

That e-mail was then distributed to WPD officers, including the street crimes unit to which Cpl. Akil was attached.[34] A little over six months later, Cpl. Akil followed this advice when drafting the *Robinson* arrest warrant[35]—the first for which he was including information that came from his use of covert social media surveillance.[36] In that warrant he averred: *first*, that he "received information from a confidential informant" that the suspects were in a particular vehicle and in possession of a firearm; and *second*, his unit later "then received information from a confidential informant" the about the possible whereabouts of one of those suspects.[37]

About a month later at the *Robinson* preliminary hearing, Cpl. Akil testified:

Q. Can you walk us through how this investigation began?

A. Yes. So August 14th of 2020 at approximately 1250 hours I was notified by a confidential informant that Deonte Robinson and another male were occupying a Nissan --[38]

The examining Deputy Attorney General immediately interrupted Cpl. Akil and the two corrected the misrepresentation—identifying the true source of the information to be Cpl. Akil's personal real-time observations made via his covert social media

---

[34] *Jackson* Prelim. Hr'g Tr. at 13-14; *Jackson* Supp. Hr'g Tr. at 17-19.

[35] *Robinson* Arrest Warrant (Ex. B, Def. Mot. to Compel (D.I. 20)).

[36] *Jackson* Supp. Hr'g Tr. at 19.

[37] *Robinson* Arrest Warrant at 3.

[38] *Robinson* Prelim. Hr'g Tr. at 6.

account.[39] Cpl. Akil later explained in the *Robinson* hearing—as he has time and again in these proceedings—that he identified the fruits of his own online surveillance as coming from "a confidential informant" because he was "taught" to do so.[40] And he's further explained by that he meant he was trying to assiduously follow the advice given in the DelDOJ's February 2020 e-mail.[41]

Again, Cpl. Akil's conduct in the *Robinson* case was reported by the DelDOJ to the WPD, subjected to a WPD professional-standards investigation, and never led to imposition of any discipline.[42] But the DelDOJ did include and retain Cpl. Akil on its "*Brady* list."

### 3. Rule 608 and Cpl. Akil's Conduct in the *Robinson* Case

The State readily disclosed Cpl. Akil's activity in the *Robinson* case to Mr. Jackson here—where Cpl. Akil would be testifying as to his observations and actions related to Mr. Jackson's stop and seizure.[43] And that evidence was used to attempt to impeach Cpl. Akil as a State's witness during Mr. Jackson's suppression

---

[39]  *Id.* at 6-9.

[40]  *Id.* at 18 ("Well, I was taught and I was also advised that we could use social media accounts as a notifier and describe them in the report as confidential informants.  That's what I was always taught.").

[41]  *E.g., Jackson* Prelim. Hr'g Tr. at 14 ("My wording was confidential informant because [the Deputy Attorney General's] exact wording in the email that he sent was confidential informant."); *Jackson* Supp. Hr'g Tr. at 19, 25-28.

[42]  *Jackson* Prelim. Hr'g Tr. at 13-17; State's Mot. *in Limine* at 3.

[43]  *Jackson* Prelim. Hr'g Tr. at 13.

hearing.[44]

Thereafter, the State argued that given what occurred in the *Robinson* matter as explained by Cpl. Akil and demonstrated by the e-mail on which he relied, any questioning of him thereon at any proceeding is inappropriate.[45]  Hardly so.

Rule of Evidence 608(b) governs how and when the introduction of a witness's "bad acts" that are probative of truthfulness or untruthfulness may be allowed to impeach him.[46]  "There are four factors a trial court should consider when making that determination: (1) whether the testimony of the witness being impeached is crucial; (2) the logical relevance of the specific impeachment evidence to the question at bar; (3) the danger of unfair prejudice, confusion of the issues and undue delay; and (4) whether the evidence is cumulative."[47]

The first factor, the importance of the testimony of the witness being impeached, heavily favors Mr. Jackson.  The vehicle that Mr. Jackson was in was pulled over based solely on Cpl. Akil's supposed visual observation of Mr. Jackson

---

[44]  *See Jackson* Supp. Hr'g Tr. at 25-28.

[45]  State's Mot. *in Limine* at 4 ("State . . . does not believe . . . that the use of the information should be allowed in any further proceedings where Cpl. Akil is called as a witness."); State's Ans. to Supp. Mot. at 11 ("[Cpl. Akil's] prior misrepresentation is inadmissible character evidence."); *id.* at 16 (insisting that because Cpl. Akil made the representations "under advice of the D[el]DOJ. He was not untruthful."); State's Post-Hr'g Br. at 9, *State v. Aaron A.  Jackson*, ID No. 2103011314 (Del. Super. Ct. Apr. 14, 2022) (D.I. 27) (arguing Mr. Jackson should be precluded from cross-examining Cpl. Akil on his *Robinson* conduct at trial).

[46]  *Harper v. State*, 970 A.2d 199, 201 (Del. 2009); *Manna v. State*, 945 A.2d 1149, 1155-56 (Del. 2008).

[47]  *Harper*, 970 A.2d at 201 (citations omitted).

-12-

preparing what appeared to be a marijuana-stuffed cigar in the front seat. Because that seizure was warrantless, the State has the burden of proving its validity by a preponderance of the evidence.[48] And in its attempt to shoulder this burden, the State called Cpl. Akil as its only suppression witness to relay what he saw, give his interpretation thereof, and recount his actions related to Mr. Jackson's stop and seizure.

The second factor, the logical relevance of the impeachment evidence to the question at bar, also favors Mr. Jackson. The State has endeavored to explain the reasoning for Cpl. Akil's warrant and testimonial averments made in *Robinson*, but even its own most generous labeling admits they were knowing "misrepresentations" in sworn statements to a judicial factfinder.[49] And while no doubt the product of patent misadvice by a prosecutor,[50] those misrepresentations weren't benign. The

---

[48] *See Juliano*, 254 A.3d at 392 (quoting *Hunter*, 783 A.2d at 560).

[49] *E.g.,* State's Ans. to Supp. Mot. at 11-14; State's Post-Hr'g Br. at 8.

[50] To be clear, it is NOT "acceptable" for a law enforcement officer to aver under oath that his own observation via social media surveillance was instead information provided by a "confidential informant."

This is not to say law enforcement's surreptitious use of social media is impermissible; it certainly has been recognized as a valid investigatory tool. *See Everett v. State*, 186 A.3d 1224, 1236 (Del. 2018) (affirming denial of suppression motion after finding "the Fourth Amendment does not guard against the risk that the person from whom one accepts a 'friend request' and to whom one voluntarily disclosed such information might turn out to be an undercover officer or a 'false friend'"); *Commonwealth v. Carrasquillo*, 179 N.E.3d 1104, 1120-21 (Mass. 2022) (affirming denial of suppression motion after finding defendant did not have a reasonable expectation of privacy of his private social media account after the defendant accepted an undercover officer's friend request); *United States v. Montijo*, 2022 WL 93535, at *8 (M.D. Fla. Jan. 10, 2022) (denying suppression motion after finding defendant did not have a reasonable expectation of privacy in a video message sent to another Facebook user); *United States v. Dever*, 2012 WL

-13-

first were included to influence a judge to find probable cause, and misidentified the source of key evidence (though not the substance of the evidence itself) in a material way; the second in sworn testimony. The use of "confidential informant" has well-accepted and significant meaning in that context.[51] And while Cpl. Akil's employing

12540235, at *2 (N.D. Okla. Dec. 28, 2012) (denying suppression motion after finding defendants' expectation of privacy ended when "they disseminated posts to their 'friends' because those 'friends' were free to use the information however they wanted–including sharing it with the government" (citation omitted)); *United States v. Meregildo*, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012) (denying suppression motion after finding defendant "surrendered his expectation of privacy" by sharing posts with his Facebook friends).

And even the continued keeping of such concealed during the investigative stage is untroubling. Certain ruses and some amount of deception as investigative tools have been long-tolerated. *E.g., Hicks v. State*, 1990 WL 168284, at *2 (Del. Sept. 13, 1990) ("The use by law enforcement officers of deception and trickery to expose criminal activity is not improper or sufficient standing alone to establish entrapment." (citation omitted)); *Evans v. Phelps*, 2012 WL 1134482, at *10 (D. Del. Apr. 2, 2012) (finding "a law-enforcement agent may use some psychological tactics or even actively mislead a defendant in order to obtain a confession, provided that a rational decision remains possible" (citation omitted)).

But that must all end at the courthouse door. If a police officer undertakes to present the covertly-developed information to a judicial factfinder whose probable cause (or other necessary legal finding) she's seeking, she must use no false label to try to conceal its source from that proceeding's factfinder—the officer must make the decision whether to "burn" that specific resource or not; there is no middle ground. And here the emailing prosecutor's attempt to accommodate law enforcement's want to not reveal such covert social media surveillance was inexplicable.

[51] Indeed, anyone would understand that misrepresentation to have the effect of diverting the warrant-affidavit's reader from the true facts—that the officer used and was referring to his own watching of social media through an undercover digital persona—to a belief that there was some natural human being with valuable insider information who had obtained and reported that information to the police. *See Confidential Informant,* BLACK'S LAW DICTIONARY 373 (11th ed. 2019) ("*Someone* who provides information to a law-enforcement agency . . . on the express or implied guarantee of anonymity.") (emphasis added); *Confidential Informant*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/confidential-informant (last visited Jan. 22, 2023) ("*A person* who secretly gives information to the police about criminal activity.") (emphasis added). *See also United States v. Crawford*, 943 F.3d 297, 306 (6th Cir. 2019) (noting "the vital role confidential informants can play in furthering criminal investigations").

-14-

agency found administrative discipline unwarranted—which can be a weighty consideration in such circumstances—it is hardly dispositive here.[52]

At issue now in this suppression hearing is whether the Court can, when deciding the constitutional challenge posed, confidently credit Cpl. Akil's sworn testimony relaying what he purportedly saw, how he interpreted it, and key facts related to Mr. Jackson's stop and seizure.

The third factor—the danger of undue prejudice, confusion of the issues and undue delay—is either neutral or also slightly favors Mr. Jackson.

As a general matter, such questioning is paradigmatic impeachment.[53] "[T]he cross-examination attack . . . [is limited] to acts which have a significant relation to the witness's credibility."[54] And courts have found a witness's prior instances of giving false testimony to be sufficiently related to credibility; so, they can be inquired of to impeach.[55]

---

[52]   In neither of the State's cited cases was there the straightforward evidence (and admissions) of the challenged officers' actual prior conduct like that here. *See State v. Tilghman*, 2010 WL 703055, at *1 (Del. Super. Ct. Feb. 25, 2010); *United States v. Johnson*, 195 F. App'x 52, 62 (3d Cir. 2006).   There is no question as to what Cpl. Akil wrote and said in *Robinson*, just explanations why he was motivated and felt it acceptable to make such misrepresentations.

[53]   *See* 3 MUELLER & KIRKPATRICK, FEDERAL EVIDENCE (2d ed. 1994) § 264 (noting that under even the most focused view, Rule 608 and modern cases clearly approve questioning on a witness's prior behavior that bears on veracity and noting that questioning on alleged instances of a witness's prior falsehood or deception are included thereunder).   "The Delaware Uniform Rules of Evidence are modeled upon the Federal Rules of Evidence." *Atkins v. State*, 523 A.2d 539, 542 (Del. 1987). And F.R.E. 608(b) is nearly identical to D.R.E. 608(b), and functionally identical for the purpose of this analysis. *Compare* F.R.E. 608, *with* D.R.E. 608.

[54]   1 MCCORMICK ON EVIDENCE § 41 (8th ed. Supp. July 2022) (citing cases).

[55]   3 MUELLER & KIRKPATRICK, FEDERAL EVIDENCE (2d ed. 1994) § 264 (citing cases).

Once that witness is so impeached, the sponsoring party can attempt to rehabilitate him. And as demonstrated here, one common method of doing so may be through the introduction of relevant supportive evidence[56] "to show that any misconduct []he was asked about did not occur or that other circumstances not mentioned during the earlier questioning are important in evaluating the conduct."[57]

Though made a bit more daunting than necessary in this particular proceeding, proper cross-examination on Cpl. Akil's *Robinson* conduct is relatively straightforward. So too is the State's attempt at rehabilitation.[58] In this instance, the presentation of the *Robinson* impeachment evidence doesn't risk confusing the Court about the key issues in this suppression hearing. Nor has the State demonstrated how that presentation has caused it substantial prejudice.

Factor four, whether the evidence is cumulative, also favors Mr. Jackson. The impeachment evidence is not cumulative. It is, though, a recognized means by which to attack Cpl. Akil's credibility where no other negative character evidence has been

---

[56]   1 MCCORMICK ON EVIDENCE § 47 (8th ed. Supp. July 2022).

[57]   3 MUELLER & KIRKPATRICK, FEDERAL EVIDENCE § 270 (2d ed. 1994) (citing cases); *see* 1 IMWINKELRIED ET AL., COURTROOM CRIMINAL EVIDENCE § 717 (5th ed. 2011).

[58]   To attempt to rehabilitate Cpl. Akil after the questioning on his *Robinson* conduct, the State gave Mr. Jackson and the Court a highly redacted printout of the beforementioned e-mail. *Jackson* Supp. Hr'g, Ct.'s Ex. 1; *see Jackson* Supp. Hr'g Tr. at 19-24. Prompted by Mr. Jackson's later motion to compel (D.I. 20), the Court examined the unredacted e-mail *in camera* and determined no information relevant to the specifics of this attempted credibility attack had been censored. *Jackson* Status Conf. Tr. at 5-6, *State v. Aaron A. Jackson*, ID No. 2103011314 (Del. Super. Ct. Mar. 16, 2022) (D.I. 29). The Court also inspected *in camera* the Wilmington Police Department-Office of Professional Standards' materials related to the investigation of Cpl. Akil's conduct in the *Robinson* case; the Court found no additional disclosures therefrom were necessary. *Id.* at 6-7.

proferred. So, the impeachment evidence is not cumulative.

Taking all the 608(b) factors together, each favors Mr. Jackson in the analysis required for admission and use in this particular inquiry.[59] And so, the Court has given due consideration to the *Robinson* impeachment evidence as but one factor in assessing Cpl. Akil's credibility as the State's sole witness here.

That said, when making its findings in a suppression proceeding, the Court must evaluate the credibility of any witness[60] by giving due weight to all the usual factors identified in such exercise[61] as well as any impeachment or counter evidence presented. And at bottom, the Court's findings here are—as they in the norm are— "based upon physical evidence, documentary evidence, testimonial evidence, or inferences from those sources jointly or severally."[62]

## B. FACTUAL FINDINGS RELATED TO THE STOP OF THE VEHICLE IN WHICH MR. JACKSON WAS TRAVELLING

On March 19, 2021, Cpls. Akil and Vasquez, and Patrolman Thomas were on

---

[59] As mentioned before, the State seemingly seeks absolution for Cpl. Akil on this issue and some blanket declaration that his *Robinson* conduct may never be inquired-of again. *See supra* note 45. But those the Court cannot grant. For, as demonstrated here, the *Harper* Rule 608(b) examination is proceeding-specific. Even here, the result was admission at the suppression hearing, but could be exclusion at trial; it depends on Cpl. Akil's role as a witness in a given proceeding.

[60] *Diggs*, 257 A.3d at 1006; *State v. Brown*, __ A.3d __, 2023 WL 164302, at *3 (Del. Super. Ct. Jan. 11, 2023) ("At a suppression hearing, the Court sits as the finder of fact and evaluates the credibility of the witnesses."); *see also France*, 414 F. Supp. 3d at 750.

[61] *See Anderson*, 470 U.S. at 575 (observing in a such a proceeding: "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said" (citation omitted)).

[62] *Abel*, 68 A.3d at 1232 (cleaned up).

patrol in an unmarked vehicle near the 2700 block of North Market Street.[63]

Cpl. Akil was sitting in the backseat of the unmarked vehicle.[64] At around 6:30 p.m., while still in daylight, Cpl. Akil took notice of a specific vehicle coming southbound on North Market Street.[65]

Cpl. Akil looked into that vehicle travelling in the opposite direction and saw the front-seat passenger, later identified as Mr. Jackson, roll and lick a brown cigar wrapper.[66] At its closest point, the other vehicle was approximately five to six feet away and vehicles were travelling somewhere between 10 and 25 miles per hour.[67]

Based on Cpl. Akil's knowledge and experience, he believed that Mr. Jackson was licking closed a now marijuana-laden cigar.[68] Cpl. Akil based that observation on his experience that regular tobacco cigars bought from a store do not need to have their seams licked to close, but one altered to be a marijuana cigar—*i.e.* "a blunt"—needs to be rolled and licked closed in the very manner Mr. Jackson was doing.[69]

Believing Mr. Jackson was about to light up what he believed was a blunt,

---

[63]    *Jackson* Supp. Hr'g Tr. at 5-8.

[64]    *Id.* at 6.

[65]    *Id.* at 7-8, 10.

[66]    *Id.* at 8 ("I observed him with a brown in [color] cigar leafy-style wrapper, put it up to his mouth like rolling it (indicating) . . . it's indicative of a subject who is trying to ingest marijuana through smoking it); *id.* at 32 ("I saw him, up to his mouth, he's rolling it -- so as you're rolling it, you're licking it, you're rolling it and you're licking it.").

[67]    *Id.* at 10, 31.

[68]    *Id.* at 11-13.

[69]    *Id.* at 9-12.

Cpl. Akil alerted Cpl. Vasquez and Ptlmn. Thomas.[70]  The officers pulled over the vehicle and Cpl. Akil approached Mr. Jackson, who was sitting in the front passenger seat of the vehicle.[71]

With the windows of the vehicle down, Cpl. Akil saw "a small green in color plant-like substance crumbled in [Mr. Jackson's] lap area" and "smell[ed] a strong odor of marijuana emanating from the vehicle."[72]  At that point Cpl. Akil explained to Mr. Jackson: "the reason why we're stopping you is because I saw you rolling a blunt."[73]  In response, Mr. Jackson "shook his head and . . . acknowledged . . . that he understood what [Cpl. Akil] said and . . . understood what [Cpl. Akil] saw and what [Mr. Jackson] was doing."[74]

### C. OFFICERS HAD REASONABLE ARTICULABLE SUSPICION TO STOP THE VEHICLE.

"In the traffic stop context, . . . a seizure is reasonable when a law enforcement officer conducts a brief investigatory traffic stop based on reasonable and articulable suspicion of criminal activity."[75]  "Reasonable suspicion is defined as the officer's

---

[70]  *Id.* at 13.

[71]  *Id.* at 14.

[72]  *Id.* at 14-15.

[73]  *Id.* at 15.

[74]  *Id.*

[75]  *West*, 143 A.3d at 716 (citing *Terry*, 392 U.S. at 20-21 and DEL. CODE ANN. tit., 11 § 1902(a)). It was Mr. Jackson's behavior alone that led the police to stop the vehicle.  In that sense, the car stop is analytically akin to a pedestrian stop for which the applicable reasonable suspicion standards are the same. *See Moody v. State*, 2006 WL 2661142, at *2-3 (Del. Aug. 24, 2006) (allowing detention of a suspect on reasonable articulable suspicion after observing him discard

ability to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrants the intrusion."[76]

"In determining whether reasonable suspicion exists, the court looks at the totality of the circumstances, as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[77] A finding that reasonable articulable suspicion exists does not require an ultimate finding of contraband or illegal activity, rather it need only be found that a reasonable articulable suspicion "support[ed] the belief that[] 'a crime had just been, was being, or was about to be committed.'"[78]

Here, Mr. Jackson contends that "[b]ecause Cpl. Akil only saw what looked to be a marijuana cigar, the officers did not have reasonable articulable suspicion to stop [the] car."[79] Mr. Jackson, citing numerous other jurisdictions, suggests that the mere observation of a hand-rolled cigarette or cigar is insufficient for a finding of

---

what an officer believed was "a 'blunt'—a cigar known by police to be commonly hollowed out and filled with marijuana"); *Spencer v. State*, 2018 WL 3147933, at *3 (Del. June 25, 2018) (allowing detention of a suspect on reasonable articulable suspicion after observing him bicycling on the wrong side of the road while smoking a marijuana cigar that he then handed to another).

[76] *Holden*, 23 A.3d at 847 (citation and internal quotation marks omitted).

[77] *Hall v. State*, 981 A.2d 1106, 1111 (Del. 2009) (citations and internal quotation marks omitted).

[78] *Backus v. State*, 845 A.2d 515, 517 (Del. 2004) (quoting *Robertson v. State*, 596 A.2d 1345, 1350 (Del. 1991) (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979))).

[79] Def. Mot. to Suppress at 5, *State v. Aaron A. Jackson*, ID No. 2103011314 (Del. Super. Ct. Aug. 12, 2021) (D.I. 5).

reasonable articulable suspicion of a marijuana offense.[80]

But there is more particularized evidence and interpretation here. Cpl. Akil saw Mr. Jackson put the apparently altered cigar wrapper to his mouth and lick and roll it.[81] Based on Cpl. Akil's training and experience,[82] he believed that Mr. Jackson was rolling, and preparing to smoke, a blunt.[83] Cpl. Akil explained why he would associate Mr. Jackson's actions with marijuana ingestion as opposed to ordinary cigar smoking. He had seen the rolling and preparing of blunts for smoking hundreds of times before.[84]

The objective evidence submitted at the suppression hearing corroborates Cpl. Akil's recounting of what exactly he saw and his interpretation of what Mr. Jackson was doing. In the cupholder right next to Mr. Jackson were two blunts.[85] On Mr. Jackson's lap and seat were crumbs of marijuana and a lighter.[86] And in the

---

[80] Def. Supp. Ltr. at 2-3, *State v. Aaron A. Jackson*, ID No. 2103011314 (Del. Super. Ct. Apr. 14, 2022) (D.I. 28).

[81] *Jackson* Supp. Hr'g Tr. at 8, 32.

[82] At the time of the incident, Cpl. Akil had been a Wilmington Police Department officer for more than six years, half of that time with the Street Crimes Unit. *Id.* at 4; *see also id.* at 11 ("Q. Through your training and experience as a police officer, are you familiar with the ways that individuals can smoke marijuana? A. Yes. Q. Have you seen these cigar wrappers used as marijuana blunts before observing the defendant on March 19th? A. Yes.").

[83] *Id.* at 10-12; *see United States v. Brown*, 2008 WL 4936517, at *1 (D. Mass Nov. 17, 2008) (detaining suspect after observing the front-seat passenger "taking a drag" from a small cigar which the defendant held "between his thumb and forefinger"), *aff'd*, 621 F.3d 48 (1st Cir. 2010).

[84] *Jackson* Supp. Hr'g Tr. at 10-12.

[85] *Jackson* Supp. Hr'g, State's Exs. 2 and 3; *see also Jackson* Supp. Hr'g Tr. at 15-16, 28-29.

[86] *Jackson* Supp. Hr'g, State's Ex. 2; *see Jackson* Supp. Hr'g Tr. at 15.

-21-

door pocket next to him was a small bag of marijuana.[87]   In other words, all these items were consistent with Mr. Jackson having just prepared a blunt for use or consumption in precisely the manner Cpl. Akil knew it to be done.[88]

Sixteen *Del. C.* § 4764(d) makes the use or consumption of marijuana in a moving vehicle a misdemeanor.[89]   And under the reasonable articulable suspicion standard, an officer can stop a vehicle or individual if "that . . . person is committing, has committed, or is about to commit a crime."[90]   Based on Cpl. Akil's observations, he reasonably believed that a violation of Delaware's marijuana laws was being or was about to be committed.   This gave Cpl. Akil, and the officers with him, reasonable articulable suspicion to pull over the vehicle in which Mr. Jackson was riding.   So that initial seizure of Mr. Jackson's person—the stop of the vehicle—was constitutionally permissible.

### D. THERE IS NO BASIS TO EXCLUDE ANY OF THE ITEMS—A GUN AND PURPORTED DRUGS—RECOVERED FROM THE VEHICLE IN WHICH MR. JACKSON WAS A PASSENGER.

After the officers pulled over the vehicle Mr. Jackson was travelling in,

---

[87]   *Jackson* Supp. Hr'g, State's Ex. 4; *see Jackson* Supp. Hr'g Tr. at 16-17.

[88]   *Jackson* Supp. Hr'g Tr. at 10-12.

[89]   DEL. CODE ANN. tit. 16, § 4764(d) (2021) ("Any person who knowingly or intentionally uses or consumes up to a personal use quantity of a controlled substance or a counterfeit controlled substance classified in § 4714(d)(19) of this title in an area accessible to the public or in a moving vehicle, except as otherwise authorized by this chapter, shall be guilty of an unclassified misdemeanor and be fined not more than $200, imprisoned not more than 5 days, or both.").

[90]   *Holden*, 23 A.3d at 847 (citations omitted).

Cpl. Akil asked the occupants, including Mr. Jackson, to step out of it.[91] Mr. Jackson complied and exited the vehicle.[92] Thereafter, officers began to search the vehicle for any more possible marijuana inside.[93] As they neared the seat that he had previously occupied, Mr. Jackson shoved an officer aside and began to run.[94]

Once a vehicle is validly stopped, the police may have the vehicle's driver and passengers step out of it.[95] When that happens, mere passengers lose any potential standing they may have had to challenge evidence gathered from a later search of the vehicle.[96] And no doubt Mr. Jackson's fleeing from the officers as they were beginning the vehicle search demonstrated his intent to abandon any previous possessory interest in the items to be found.[97]

---

[91] *Jackson* Prelim. Hr'g Tr. at 8.

[92] *Id.*

[93] *Id.*

[94] *Id.* at 8-9.

[95] *Loper v. State*, 8 A.3d 1169, 1174 (Del. 2010); *Pennsylvania v. Mimms*, 434 U.S. 106, 107-11 (1977).

[96] *State v. Goldsborough*, 2022 WL 3695054, at *2 (Del. Super. Ct. Aug. 23, 2022) ("a mere passenger in a vehicle does not have standing to challenge a search" (citations omitted)); *United States v. Baker*, 221 F.3d 438, 441-42 (3d Cir. 2000) ("It is clear that a passenger in a car that he neither owns nor leases typically has no standing to challenge a search of the car." (citing *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978)); *see Mills v. State*, 2006 WL 1027202, at *2 (Del. Apr. 17, 2006) (finding a mere passenger lacks "standing with respect to the . . . search of [a] vehicle").

[97] *See Jackson v. State*, 990 A.2d 1281, 1289 (Del. 2009) ("Property discarded by a suspect who refuses to submit to an officer's authority and flees is deemed abandoned." (citing *California v. Hodari D.*, 499 U.S. 621, 629 (1991)).

## IV. CONCLUSION

The Court has engaged the necessary credibility determination and given such weight to Cpl. Akil's testimony as it found was due. The Court has also considered the testimonial evidence, physical evidence, documentary evidence, and the legitimate inferences from those sources jointly and severally in making its findings.

That done, Cpl. Akil and his partner Wilmington police officers had a reasonable articulable suspicion that Mr. Jackson was committing or about to commit a criminal offense. It was, therefore, permissible for them to pull over the vehicle in which Mr. Jackson was a passenger. Accordingly, Mr. Jackson's Motion to Suppress the evidence uncovered through and after that stop is **DENIED**.

**IT IS SO ORDERED.**

**Paul R. Wallace, Judge**